UNITED STATES, Appellee

v.

CLARENCE G. ELLWEIN, Staff Sergeant,
U. S. Air Force, Appellant

6 USCMA 25, 19 CMR 151

No. 6048

Decided June 10, 1955

COL A. W. Tolen, USAF, and CAPT Donald C. Helling, USAF, for Appellant.

LT COL Emanuel Lewis, USAF, MAJ Roger H. Miller, USAF, and CAPT Giles J. McCarthy, USAF, for Appellee.

Opinion of the Court

PAUL W. BROSMAN, Judge:

We are concerned here with a further wire tapping problem. The accused was found guilty, following trial by an Air Force special court-martial, under two specifications alleging that, on February 8, 1954, and again on April 11, 1954, he had orally communicated by telephone certain indecent and obscene language to a Mrs. Laven and a Mrs. Panosian, respectively—in violation of the Uniform Code of Military Justice, Article 134, 50 USC § 728. The sentence imposed by the court included a bad-conduct discharge, and both it and the findings have been approved by intermediate appellate authorities. We granted the accused's petition for review that we might determine whether his conviction had been based on evidence obtained in violation of Section 605 of the Communications Act of 1934, 47 USC § 605.

II

The Government opened its case by introducing the stipulated testimony of Mrs. Laven to the effect that, on February 8, 1954, she had received a telephone call from an unknown man, who, using the obscene language set out in the specification, presented to her a lewd proposal. Mrs. Panosian's expected testimony was also the subject of a stipulation between the Government and defense. This latter victim recited that, at approximately 7:45 p.m. on April 11, she had been telephoned by an

unknown male person, who also used the obscene and indecent language recited in the appropriate specification. She informed the speaker that she proposed to arrange that the call be traced, and thereupon he promptly severed the connection.

The prosecution next offered in evidence a confession, which the accused had executed on April 14 in the presence of a Mr. Jacks, an agent of the Office of Special Investigations. This inculpatory statement had been made by Ellwein—who was an air police investigator and a noncommissioned officer—after full warning, as required by Article 31, 50 USC § 602. There can be no doubt of its admissibility, apart from the risk that it may fall within the ban of Section 605.

The following circumstances were established, and afforded the basis for the ruling of the president of the special court-martial, which ultimately admitted the confession. Prior to April 11, the authorities at George Air Force Base—at which the accused was stationed—as well as various civilian officials in nearby Californian towns had received numerous complaints of lewd and improper telephone calls. Among these was one from Mrs. Laven—a prosecution witness here—which report had been relayed to the Office of Special Investigations by her husband, an officer at George Field. On April 5, or April 6, 1954, a conference devoted to

26

these offensive calls was held between civilian police officials, Mr. Jacks and a Mr. Maikoski of the Office of Special Investigations, and one Captain Blow, a communications officer stationed at the Air Force Base.

At the request of the civilian officials present, and apparently with the full concurrence of Messrs. Jacks and Maikoski, the Captain agreed to monitor calls from pay stations located on the Base. However, Blow pointed out that it was feasible to monitor only one telephone at a given time—and it was thereupon decided to open the program with a check on the single pay station found at the Base Hospital. The record makes clear the reasons for this choice. At that time, Ellwein was in the hospital following an accident which had taken place during the latter part of March. He constituted the sole George Field suspect, and had been under suspicion for at least six months—as Mr. Jacks testified without contradiction. Evidence—adduced after the court-martial's findings of guilt—disclosed that the finger of suspicion had been directed toward him because of a disciplinary report which had been forwarded to George Air Force Base, and which dealt with what appear to have been similar activities in Bermuda.

According to further stipulated testimony, at about 8:15 o'clock on the evening of April 11, an airman named Brashear—who was then in charge of the monitor system installed by Captain Blow—distinguished noises indicating that coins were being dropped into the cash box of the hospital public telephone instrument. He noted the digits as they were dialed, listened to the conversation and—when he heard obscene language used—called the Officer of Special Investigations, as he had been instructed to do. Although Brashear reported to law enforcement agents the indecent expressions used during the call, at no time was it shown that he communicated to them either the telephone number dialed, or the parties to the conversation—if, indeed, he possessed information on this latter subject.

Despite the long-standing suspicion of the accused, he had not been interviewed by George Air Base authorities regarding the questionable calls prior to April 11, 1954. In fact, at that time he cannot be said to have been the subject of an "active" investigation—although, according to Mr. Jacks, he would have been interrogated "eventually . . . for sure." It appears that the accused had not been examined earlier for the reason that the Office of Special Investigations had been extremely busy, was awaiting the development of a clearer "pattern" in the lewd telephone messages, and because of his hospitalization. Mr. Jacks testified, in fact, that sometime prior to April 11 he had conferred with the hospital adjutant for the purpose of learning when Ellwein could reasonably be expected to leave the medical facility for return to duty. However, when Mr. Maikoski—who commanded the local Office of Special Investigations detachment—made contact with Jacks on the night of the 11th, and informed him that an obscene call had been put through, the latter sprang into action. Jacks testified that, at the time he began the investigation following this conversation with his superior, no complaint had been received from the recipient of the monitored call, and no detailed information had been given him of its contents. Nonetheless, with the fresh information that an improper call had been made—and only this—this law enforcement agent hastened to interview his only suspect, the accused, Ellwein.

After talking with Jacks for some fifteen minutes, the accused freely admitted that he had put through the calls in question. According to the former, he did not confront the accused with the intercepted communication—for the principal reason that the interrogator himself was not aware at this point of what had been said during the monitored conversation, nor did he know that the accused had been a party thereto. He merely suspected that Ellwein was involved. After the interview of April 11, Jacks was present in the local sheriff's office while Mrs. Panosian was being interviewed. The evidence, however, fails to show explicitly whether this lady had complained voluntarily, or

**27**

whether she had been questioned initially by the local civilian authorities. In fact, it is not made entirely clear that the call reported by her was actually the one overheard by Airman Brashear. When interviewed on April 14, the accused was able to recall the names of only two persons of the many to whom he had made indecent calls—namely Mrs. Laven, the victim in one of the specifications before us, and a "Mrs. Punise or Panosian." The later confession made on April 14 appears merely to have expanded that of April 11.

## III

There can be no question regarding the admissibility of Mrs. Laven's testimony—since her complaint █ had been reported to the Office of Special Investigations many weeks in advance of any suggestion of wire tapping. Nor can the defense complain of the reception of Mrs. Panosian's stipulated testimony, for at the trial its personnel made no slightest objection thereto. We have held that an objection to evidential material secured as a product of an illegal search must be advanced promptly by an accused. United States v. Dupree, 1 USCMA 665, 5 CMR 93. And we see no reason to apply a different rule to evidence allegedly obtained through the agency of wire tapping. Indeed, the treatment of wire tapping by the Federal courts has in many respects paralleled that of illegal search and seizure. Thus—relying on analogies from the latter field—the Supreme Court has held that one may not complain of the admission of evidence secured by wire tapping, if he was not in some manner a party to the intercepted communication. Goldstein v. United States, 316 US 114, 86 L ed 1312, 62 S Ct 1000.

Moreover, the second Nardone case—while prohibiting the use of the fruits of wire tapping—insisted that the accused's lawyer act with due diligence in objecting to evidence obtained in violation of Section 605 of the Communications Act. Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266. As is said there with respect to claims that the Government had made use of wire tapped evidence, "the judge must

likewise be satisfied that the accused could not at an earlier stage have had adequate knowledge to make his claim." Clearly there is here no reason to relieve the defense from any of the effects of waiver, since it is highly probable that Mrs. Panosian, of her own volition, had entered a complaint with respect to the improper call made to her. In this connection, it will be remembered that her stipulated testimony made explicit reference to her threat to the accused that she would endeavor to arrange that the offending telephone message be traced.

The confession presents a more difficult problem, however. As previously mentioned, to be entitled to the exclusion of evidence, █ he against whom it is offered must have been a party to the intercepted communication. Goldstein v. United States, supra. Of course, no distinction can be based on the fact that a public telephone booth was involved in the case at bar. Moreover, there can be little practical doubt that it was a message from the accused—whether directed to Mrs. Panosian or to some other person—which was overheard by Airman Brashear on the night of April 11. Thus we must conclude that the accused does enjoy standing to complain.

With respect to the merits of his complaint, two countervailing arguments have been advanced. One suggests that the confession was not a "fruit of the poisonous tree," within the meaning of Nardone v. United States, supra; and the other is based on the notion that the tree itself was not a poisonous one. This latter view opens with the premise that, under Section 605, merely to intercept a telephone conversation is not the subject of prohibition. This has long been the position of the Department of Justice—bottomed on the fact that Section 605 provides that "no person not being authorized by the sender shall intercept any communication *and* divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." (Emphasis supplied.) See Rogers, The Case For Wire Tapping, 63 Yale L J 792

(1945). This position squares with the interpretation of certain other conjunctively worded penal statutes. See, e.g., Bratton v. United States, 73 F2d 795 (CA10th Cir); Neal v. United States, 102 F2d 643 (CA8th Cir). But see Donnelly, Comments and Caveats on the Wire Tapping Controversy, 63 Yale L J 799 (1954). In addition the Court of Appeals for the District of Columbia has used the following language: "It is true, as the court pointed out, that § 605 of the Communications Act, as construed by the Supreme Court, does not make wiretapping an offense but does condemn as criminal the *interception and disclosure* of the contents of the message, *both acts being essential to complete the offense.*" (Emphasis supplied.) See Coplon v. United States, 191 F2d 749, 759, cert den 342 US 926, 96 L ed 690, 72 S Ct 363.

The argument then suggests that the only issue here is whether Airman Brashear illegally "divulged" or "published" the message, or "used" its contents "for his own benefit or for the benefit of another not entitled thereto," within the meaning of Section 605. It is obvious that the circumstance that the conversation involved the commission of an offense would not serve to legalize the divulgence of its subject matter. By way of illustration, if A and B are engaged in conspiring telephonically to violate the law, the contents of their verbal exchange, if intercepted, could, nevertheless, not lawfully be divulged. However, in that situation, the interest of *both* parties in the privacy of the conversation would have been infringed by publication. On the other hand—according to this argument—a situation involving an unwanted, obscene call is distinguishable. In this latter instance, of course, it is not the interest of both parties to the conversation which supports whatever policy against divulgence there may be. Instead, the very message itself has operated to invade the privacy of the unwilling recipient. The conclusion would follow that it was not the purpose of Congress to protect against detection one's right to insult or abuse another through the agency of this means of communication. See United States v. Noce, 5 USCMA 715, 19 CMR 11 (concurring opinion). This reasoning, however interesting, does not require evaluation for the purposes of the present decision since—even if the interception and divulgence, if any, here were illegal—the confession is not, we are sure, a "fruit of the poisonous tree."

The "poisonous tree" doctrine stems from the pronouncement in Silverthorne Lumber Co. v. United States, 251 US 385, 64 L ed 319, 40 S Ct 182—a search and seizure case—that "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. *If knowledge of them is gained from an independent source they may be proved like any others,* but the knowledge gained by the government's own wrong cannot be used by it in the way proposed." (Emphasis supplied.)

In Nardone v. United States, supra, this doctrine was applied to information secured by means of wire tapping. The Court pointed out, however, that:

"In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. *As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint.* A sensible way of dealing with such a situation—fair to the intendment of § 605, but fair also to the purposes of the criminal law— ought to be within the reach of experienced trial judges." [Emphasis supplied.]

In a number of cases, lower Federal courts have applied the "poisonous tree" doctrine. In Nueslein v. District of Columbia, 115 F2d 690, for example, the Court of Appeals for the District of Columbia held that an admission made to investigating officers who had illegally entered the accused's dwelling could not be used against him at his

**29**

trial. Under the facts of that case, the decision probably represents the zenith of the Silverthorne doctrine. In United States v. Goldstein, 120 F2d 485 (CA2d Cir), aff'd 316 US 114, 86 L ed 1312, 62 S Ct 1000, however, the record revealed that a number of persons had become prosecution witnesses after confrontation by records of their wire tapped conversations. Nevertheless, these witnesses had asserted that their decision to testify had, in fact, been independent of the recordings they had heard. The Court of Appeals indicated that, under the circumstances, it would not have been willing to disturb an express finding by the trial judge that the wire tapping involved had not led to the testimony supplied by the prosecution witnesses. However, no such express finding had been made at the trial. It is apparent, therefore, that the court would have concluded that the prosecution evidence was inadmissible, if the defendants had possessed standing to complain. Yet rather clearly—and pursuant to the probable intendment of the Nardone case, supra—there was recognized an area within which the inadmissibility of evidence connected only remotely with wire tapping would depend on the determination of the trial judge.

In a very recent case the evidence established that a policeman had listened by means of a telephone extension while an informer made contact with a suspect, and arranged to meet him "at the usual place . . . at 3 o'clock"—in order that a narcotics transaction might be consummated. The appointment was kept, and the policeman arrested the defendant *in flagrante delicto*. However, the Court of Appeals held that, if Section 605 had been violated, the connection between that violation and the ultimate arrest was too attenuated to preclude the prosecution from showing that the defendant had been apprehended in the course of a narcotics sale. United States v. Sullivan, 219 F2d 760 (CA DC Cir).

United States v. Bayer, 331 US 532, 91 L ed 1654, 67 S Ct 1394, is also pertinent for present purposes, although it involves neither wire tapping nor illegal search and seizure. There an accused executed a confession on September 5, 1944, at which time he was held in what the Court regarded as illegal restraint. Thus, under the rule of McNabb v. United States, 318 US 332, 87 L ed 819, 63 S Ct 608, the confession would have been inadmissible. Later, on March 15, 1945, the accused made a second confession—this time to an agent of the Federal Bureau of Investigation. He was then under administrative restriction only at an Air Force Base—and had been warned by the agent that any statement he supplied might be used in evidence against him. At this time, the defendant had before him his original inculpatory statement —and the second document was merely "supplementary" thereto, and "basically the same" as the earlier one, although phrased in greater detail. The Court of Appeals concluded, on authority of the Nardone and Silverthorne cases, that the second confession was inadmissible. The Supreme Court's contrary view is expressed in the following words:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. The Silverthorne and Nardone cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and do not control this question. The second confession in this case was made six months after the first. The only restraint under which Radovich labored was that he could not leave the base limits without permission. Certainly such a limitation on the freedom of one in the Army and subject to military discipline is·not enough to make a confession voluntarily given after

fair warning invalid as evidence against him. We hold the admission of the confession was not error. Cf Lyons v. Oklahoma, 322 US 596, 64 S Ct 1208, 88 L ed 1481." [United States v. Bayer, supra.]

We must admit to some uncertainty with respect to the peremptory dismissal in Bayer of the applicability of the Nardone and Silverthorne cases. However, we are sure that the policy against the introduction in evidence of involuntary confessions, and that against the placing of suspects in illegal detention, is fully as strong as the one against wire tapping. Thus, the distinction does not lie in any want of importance of the interests involved in Bayer. Perhaps the chief meaning of Bayer within the present context is the presumption it appears tacitly to erect in favor of the admissibility of a confession "voluntarily given after fair warning." Cf. United States v. Monge, 1 USCMA 95, 2 CMR 1. To be sure, there may be instances in which—despite warning of the right to remain silent and an absence of threats or coercion—a confession may be so intertwined with a previous illegal search and seizure, or a wire tapping operation, as to be inadmissible. To illustrate, a confession has been held inadmissible under military law when made after an accused was confronted by items of stolen property which had been seized from him illegally—and this despite the fact that he had been advised of his right to remain silent. See United States v. Darby [ACM 1144], 2 CMR (AF) 200.

In the present case, however, the connection between the results of the monitoring scheme, on the one hand, and the confession, on the other, was infinitely more attenuated. The accused had long been under suspicion, and would ultimately have been interviewed by law enforcement agents regarding the obscene phone calls which had been the subject of complaint. In truth, the decision to postpone interrogation appears to have been due in part to compassionate reasons, and in part to a hope that with time he would erect a better case against himself. To be sure, he might not have been interrogated on April 11 had not a further ob-scene call been made—and this occasion may conceivably have constituted an especially propitious moment for the examination. However—according to the testimony of Agent Jacks—the accused was at no time confronted with the intercepted conversation, the contents and personnel of which were then wholly unknown to Jacks himself. Ellwein did not seek to deny this assertion by his erstwhile interrogator, and did not himself testify that he was influenced in any remotest degree to confess by information connection with or growing out of wire tapping. As a matter of fact, the testimony of Agent Jacks makes evident that—once the matter had been raised—the accused was almost eager to confess, "that he was glad it was all out in the open now and maybe he'd get some assistance, get over this thing. He was glad it finally got in the open. He said he knew it was bound to someday and he was glad it finally came to a head."

We are aware that there is substantial authority for the position that—once illegal wire tapping has been shown—the Government labors under the burden of establishing that its evidence was not the product of such an activity, but instead had enjoyed an independent source. See Coplon v. United States, supra. See also 28 ALR2d 1055. However, regardless of the placement of the burden of proof in the present case, we are sure that—when the problem is viewed, not through the spectacles of unrealistic technicality, but in a relaxed and reasonable manner—the trial court was justified in holding that the confession by the accused, himself an experienced senior air police investigator, was the product not of wire tapping but of an independent act of his own will. Thus, under our construction of Bayer and Nardone, to admit this evidence fell fully within the trial court's discretion.

### IV

It follows that the conviction must be and is hereby affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The issue presented here is whether

**31**

the accused's confession was procured through the use of the un- ██ lawful "taps," and I start with the premise that the "taps" tainted the confession, if they procured it. Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266. A short resume of the facts will disclose why I conclude procurement is so implicit in this record as to be clearly visible to those who believe the Communications Act should apply to persons in the services.

Complaints concerning obscene telephone conversations had been received over a substantial period of time and the local sheriff contacted Air Force officials to have them install an intercept system on the Base. Although the accused had been suspected for some six months, and was the only suspect, Mr. Jacks, a special agent of the Office of Special Investigations, had just never taken the time to interview him. While the accused was confined to the hospital because of an accident, it was decided—I suppose without giving any thought to catching the only suspect—to tap the pay telephones on the Air Base. What a fortunate happenstance it was that Mr. Jacks and the military authorities selected the one pay telephone in the Base hospital area, the only telephone readily accessible to the accused, as the first to be tapped. When the offensive telephone call was made, Mr. Jacks was promptly informed of its obscene nature by a personal messenger, and although it was 9:30 p.m., Sunday evening, he proceeded forthwith to the hospital to interview the accused with regard to the indecent telephone call.

The sudden urge on the part of Mr. Jacks to get behind him a task which he had been unable to complete in a rather lengthy period would alone cause me to believe the interception furnished the lead to this conviction. But I need not rely on any sort of inferential process, for Mr. Jacks admitted—in response to a series of questions asked by a court member—that this one monitored obscene telephone call caused him to go directly to the accused and interview him concerning his participation in the intercepted conversation. Although Mr. Jacks testified that he did

not know for certain who had made the telephone call, he knew the accused was in the hospital, he knew the monitored telephone was in the hospital, he knew the telephone message was obscene, and the accused was his only suspect. Furthermore, no complaint had been made by the victim prior to the interrogation and so the source of knowledge of the nature of the message could only have been the intercept. It really takes no imagination on my part to conclude that because of the illegal intercept, Mr. Jacks knew the accused had made an indecent telephone call, and he immediately, at a rather unusual time, undertook the long delayed interrogation which terminated successfully.

The majority opinion seeks to rely upon Sullivan v. United States, 219 F 2d 760 (CA DC Cir) (1955), but I view that case as a slender reed of support. In that case the opinion goes on to state:

". . . one Bolen telephoned the defendant from a police station and made an appointment to meet him. On another telephone in the same station, a policeman listened to the conversation. The defendant kept the appointment and sold Bolen drugs. Police were present and arrested the defendant.

". . . Although the policeman acceded, in cross-examination, to a suggestion that his knowledge of Bolen's arrangements 'to go to the . . . delicatessen . . . and meet Sullivan . . . came from listening in on the extension wire', the policeman had testified specifically that the defendant 'agreed to meet [Bolen] *at the usual place, he said,* and at 3 o'clock.' (Emphasis added.) Since the 'usual place' was not identified over the telephone, what the police heard over the telephone did not directly enable them to be present at the criminal transaction. Neither did it alert them to question Bolen about his arrangements with the defendant, and thereby indirectly enable them to be present. *For they knew that Bolen was arranging an appointment with the defendant, and were therefore fully alerted, before*

32

*the telephone conversation took place."* [Emphasis supplied.]

Furthermore, I do not view United States v. Bayer, 331 US 532, 67 S Ct 1394, 91 L ed 1654, as being of material aid to my associates in the present instance. In my opinion, the chief meaning of Bayer within the present context is the presumption it appears tacitly to erect in favor of the admissibility of a confession voluntarily given after fair warning, *and obtained long after the termination of the illegal restraint.* With that principle I have no quarrel as, of course, the prosecution may show that the confession was not procured through the use of an unlawful intercept. My complaint here is that the record shows the contrary.

As in United States v. Noce, 5 USCMA 715, 19 CMR 11, I prefer to rely on the Manual and decisions of the Supreme Court of the United States. In the former I find this language:

"'Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of his property conducted or instigated by persons acting under authority of the United States, or if it was obtained under such circumstances that the provisions of Section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 USC 605), pertaining to the unauthorized divulgence of communications by wire or radio, would prohibit its use against the accused were he being tried in a United States district court. *All evidence obtained through information supplied by such illegally obtained evidence is likewise inadmissible.'"* [Emphasis supplied.]

In Nardone v. United States, supra, the Court stated this principle:

"We are here dealing with specific prohibition of particular methods in obtaining evidence. The result of the holding below is to reduce the scope of § 605 to exclusion of the exact words heard through forbidden interceptions, allowing these interceptions every derivative use that they may serve. Such a reading of

§ 605 would largely stultify the policy which compelled our decision in Nardone v. United States, supra. That decision was not the product of a merely meticulous reading of technical language. It was the translation into practicality of broad considerations of morality and public well-being. This Court found that the logically relevant proof which Congress had outlawed, it outlawed because 'inconsistent' with ethical standards and destructive of personal liberty.' 302 US 379, 384, 58 S Ct 275, 277, 82 L ed 314, 317. To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.' What was said in a different context in Silverthorne Lumber Co. v. United States, 251 US 385, 392, 40 S Ct 182, 183, 64 L ed 319, 321, 24 ALR 1426, is pertinent here: 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all.' See Gouled v. United States, 255 US 298, 307, 41 S Ct 261, 264, 65 L ed 647. A decent respect for the policy of Congress must save us from imputing to it self-defeating, if not disingenuous purpose."

I realize full well that the prosecution offered the written confession, made by the accused on April 14, as evidence in this case, and not the oral statement made shortly after the intercept. But nothing appears, save the passage of a relatively short time interval, to interrupt the chain of causation, and this, I believe, is not enough. Certainly in the light of this record the burden was on the Government to establish that the evidence introduced at trial was obtained independently of the illegal interception, and this was not done. See United States v. Coplon, 185 F2d 629 (CA2d Cir) (1950). I, therefore, conclude that the confession used in this case was obtained through the use of the wire tap, and the decision of the board of review should be reversed.