**UNITED STATES, Appellee,**

v.

**Larry D. STURDIVANT, Staff Sergeant
U. S. Army, Appellant.**

No. 39,810.
CM 438716.

U. S. Court of Military Appeals.

July 12, 1982.

**324**

For Appellant: *Captain Kenneth G. Gale* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Elliot J. Clark, Jr., Captain Charles E. Trant* (on brief).

For Appellee: *Captain Michael R. Smythers* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Major Robert B. Williams, Captain Lawrence W. Fitting* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

On June 29, 1979, at Fort Lewis, Washington, appellant was tried before a general court-martial composed of officers. Initially he was charged with these ten offenses which arose from a single incident:

(1) conspiracy to possess marihuana;

(2) conspiracy to transfer marihuana;

(3) conspiracy to sell marihuana;

(4) solicitation to possess marihuana;

(5) solicitation to introduce marihuana on post at Fort Lewis for purpose of transfer;

(6) solicitation to introduce marihuana on post for purpose of sale;

(7) attempted possession of marihuana;

(8) possession of marihuana;

(9) introduction of marihuana on post for purpose of transfer; and,

(10) introduction of marihuana on post for purpose of sale.[1]

---

1. The charges were drawn under Articles 80, 81 and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 880, 881 and 934.

However, after the evidence had been presented on the merits, the military judge required the prosecution to elect between the three solicitation offenses and the last three offenses, as to which the prosecutor was relying on an aider-and-abettor theory. When the prosecution elected to proceed on the solicitation offenses, the judge then dismissed the charges of possession of marihuana, introduction of marihuana on post for purpose of transfer, and introduction of marihuana on post for purpose of sale. Thereafter, the court-martial convicted appellant of the remaining seven offenses and sentenced him to a dishonorable discharge, confinement at hard labor for 3 years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. This sentence was later approved by a substitute convening authority.[2]

On grounds of insufficiency of evidence and multiplicity, the United States Army Court of Military Review set aside the findings of guilty as to all charges except conspiracy to sell marihuana and solicitation of another to introduce marihuana on post for the purpose of sale. Upon reassessment of appellant's sentence, only so much of it was affirmed as provided for confinement at hard labor for 6 months and forfeiture of $299 pay per month for a like period. *United States v. Sturdivant*, 9 M.J. 923 (A.C.M. R.1980). A dissenting judge would have set aside all the findings of guilty on grounds of insufficiency of the evidence. Upon the accused's petition, we granted review (10 M.J. 244) of issues concerning the legality of a monitored telephone conversation, multipliciousness of charges, and denial of an

opportunity to rebut the post-trial review prior to the convening authority's action. We also specified an issue concerning due process.[3]

I

As set forth by the court below, *see* 9 M.J. at 924–25, these are the material facts:

On payday morning, 30 March 1979, the First Sergeant of A Battery, 3rd Battalion, 34th Field Artillery, picked up an extension of the orderly room phone and overheard a conversation between members of his battery that went substantially as follows:

PFC Baskerville (CQ Runner): Do you have any of the good stuff?

SP4 Berry: Yes, I do.

PFC Baskerville: Is this Berry, right?

SP4 Berry: Yes, Could I speak to Sturdivant? (pause)

SSG Sturdivant (Accused): Where have you been? I have been looking for you.

SP4 Berry: I got the stuff, broke it down, and stopped by Hartsoe's house; I'll be in shortly, in about 45 minutes.

SSG Sturdivant: I'll be waiting for you.

Upon hearing the conversation, the First Sergeant suspected drug activity and reported the matter. The military police stopped Specialist Four Berry when he came on post a short time later, searched him, and found 18 half-ounce bags of marihuana. Berry admitted that he was going to sell the marihuana in the barracks and initially named the appel-

---

2. Appellant's case was reviewed by a new convening authority since the original convening authority had entered into a pretrial agreement with appellant's accomplice, who had agreed to testify against Sturdivant in exchange for a reduced sentence. *See* para. 84c, Manual for Courts-Martial, United States, 1969 (Revised edition).

3. The precise wording of the granted issues is as follows:

1. Evidence of the illegally monitored conversation and the fruits thereof were improperly admitted in evidence over defense objection.

2. Appellant was denied his opportunity to rebut the post-trial review prior to the convening authority's action. *United States v. Goode*, 1 M.J. 3 (C.M.A.1975).

3. Specification 3 of Charge II (conspiracy to sell marihuana) and specification 3 of the Additional Charge (solicit another to introduce marihuana for sale) are multiplicious for charging purposes.

4. Whether the unreasonable multiplication of charges precluded the accused from receiving a fair trial.

lant as one of his potential buyers but later at trial said he was mistaken about appellant buying that day. The police also found a piece of paper in Berry's wallet listing several names, including appellant's, with dollar amounts shown opposite them. This was an IOU list.

\* \* \* \* \* \*

To establish the offenses, the prosecution offered the testimony of the First Sergeant who overheard the conversation and Specialist Four Berry who was the seller. Berry, testifying against appellant in accordance with his pretrial agreement, stated that the appellant had called him the evening before and asked to buy a half-ounce bag of marihuana but the sale, which was to take place off post that night, had not been consummated; that over the past six months, appellant had purchased a small amount of marihuana from him on four or five occasions; and that the sales always occurred around payday.

## II

First of all, appellant contends that the testimony from his first sergeant concerning his telephone conversation with Specialist Four Berry was inadmissible because it resulted from an illegal interception of that conversation. Of course, insofar as any deprivation of a constitutional right is concerned, we find little basis for such a claim. While the overruling of *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), by *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), established that tele-

phone conversations are entitled to Fourth Amendment protection, the protection applies only to conversations for which there is a reasonable expectation of privacy.[4] When someone talks, as did appellant, over a government telephone which has six extensions, there is little reason for any expectation of privacy—at least, with respect to persons who may have ready access to some of those extensions. Here, not only did the first sergeant have full access to the extension lines to his battery's telephone,[5] but he previously had occasion openly to admonish members of his unit not to even use the telephone "[d]uring duty hours" since it was "for official business" only; for "personal business," they were to use the pay telephone which was "available, in the area." Thus, under the reasoning of such cases as *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), it is clear that Sturdivant "can[not] claim [that] a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' ... has been invaded by ... [his first sergeant's] action," 442 U.S. at 740, 99 S.Ct. at 2580; so he is not entitled to any Fourth Amendment protection.

Under paragraph 152 of the Manual for Courts-Martial, United States, 1969 (Revised edition)—which applied at the time of appellant's trial—evidence is inadmissible in a trial by court-martial if its use would be prohibited by 18 U.S.C. § 2515 or by § 605 of the Communications Act of 1934, 47 U.S.C. § 605. 18 U.S.C. § 2515 was included in Title III of the Omnibus Crime Con-

4. This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," ...—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." ... The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" ...—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

5. The first sergeant testified that "[t]wo-five-eight-one is the phone into the battery itself, with six extensions on it," and that whenever the telephone would ring, he or his CQ runner would "pick it up; ... if it's not [for me], then I hang it up." On the morning in question, he "was in the Chief-of-Firing-Battery's office when the phone rang," and when he "picked [it] up ... there was a conversation being said on it."

trol and Safe Streets Act of 1968 and post-dates most of our decisions concerning the legal protection to be afforded telephone conversations.[6] It sets forth a sweeping exclusionary rule as to wire or oral communications that have been intercepted in violation of Title III and as to the "evidence derived therefrom."[7]

For purposes of 18 U.S.C. § 2511(1)(a)—which prohibits the willful interception of "any wire or oral communication"—interception is "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4). A "wire communication" includes a telephone conversation transmitted through facilities provided by a common carrier, which "provid[es] or operat[es] such facilities for the transmission of interstate or foreign communications." 18 U.S.C. § 2510(1).

At one point Congress apparently considered excluding extension telephones completely from the definition of an "electronic, mechanical or other device." "However, some individuals perceived that in certain circumstances an ordinary extension telephone could be used to 'spy' on private conversations by either law enforcement officials or private citizens." Therefore, "the blanket exception for extension phones provided by communications common carriers in the ordinary course of their business was limited to such phones when they were being used in the ordinary course of the subscriber's or user's business." *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414,

418 (5th Cir. 1980). The definition of an "electronic, mechanical or other device" excludes only

> any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties.

18 U.S.C. § 2510(5)(a). Accordingly, when used by the subscriber or user in the ordinary course of its business, an extension telephone falls within the statutory exception and no "interception" of a conversation has occurred; otherwise evidence of a conversation overheard by means of an extension telephone is inadmissible. *Campiti v. Walonis*, 611 F.2d 387 (1st Cir. 1979); *James v. Newspaper Agency Corp.*, 591 F.2d 579 (10th Cir. 1979); *United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974).

In *Briggs v. American Air Filter Co., Inc.*, supra, the Court of Appeals raised—but did not decide—the question whether "a company policy against listening-in would affect whether an act of listening-in could be 'in the ordinary course of business.'" *Id.* at 420 n.11. It appears clear to us that such a policy would be relevant in determining whether an extension was used "in the ordi-

---

**6.** *See, e.g., United States v. Ellwein,* 6 U.S.C.M.A. 25, 19 C.M.R. 151 (1955) (monitoring calls made on a pay telephone located in the base hospital); *United States v. Gopaulsingh,* 5 U.S.C.M.A. 772, 19 C.M.R. 68 (1955) (interception by the Air Force switchboard at the K–2 Air Base in Korea of a call made from a public telephone booth on base); *United States v. DeLeon,* 5 U.S.C.M.A. 747, 19 C.M.R. 43 (1955) (listening on an extension telephone with one party's consent); and *United States v. Noce,* U.S.C.M.A. 715, 19 C.M.R. 11 (1955) (a monitoring device placed on certain telephone lines which were part of an exclusively military telephone system).

**7.** In its entirety, 18 U.S.C. § 2515 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

This exclusionary rule is broader than that required by the Fourth Amendment. *Compare Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), *with United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

nary course of business." Likewise, service directives and policies should be considered in determining whether in the military community a telephone extension has been used "in the ordinary course of business."

The Appendix to Army Regulation 20–3, which concerns wiretap, investigative monitoring and eavesdrop activities (WIMEA) information, prohibits "[w]iretap[ping], investigative monitoring and eavesdrop[ping] ... by or for Department of the Army worldwide" without "[a]dvance approval." [8] It defines

> [w]iretapping or investigative monitoring ... as the act of intercepting, listening to, or recording any telephonic conversation by use of any electronic, mechanical, or other device without the advance consent of all of the parties to the conversation.[9]

Para. 3a. "[E]lectronic, mechanical, or other device," as used in this regulation, is a term of art defined in 18 U.S.C. § 2510(5), and presumably has the same meaning in both instances. If this is true, that term as used in AR 20–3 does not include an extension telephone when "being used ... in the ordinary course of its business."

■ A message of August 25, 1980—subsequent to the trial in the case at bar—sets out "Army policy on the monitoring and recording of conversations by Army personnel." It states unambiguously that the Army "prohibits the acquisition by mechanical or electronic means of any communication," which includes,[10]

> for example, the act of listening to telephone conversations through the use of telephone extensions or telephone speaker phones, as well as the act of recording telephone or private face-to-face conversations, unless the prior consent of all parties to such monitoring or recording is obtained.

We interpret the specific reference to extension telephones as being intended only to make clear that no blanket exclusion exists for extension telephones, rather than to announce an Army policy that overhearing a conversation on an extension telephone will be considered willful interception even under circumstances where such conduct would not violate federal legislation protecting the privacy of telephone conversations.

■ Accordingly, if Sturdivant's first sergeant was using the extension telephone "in the ordinary course of business" when he overheard appellant,[11] no "interception" occurred.[12] Thus, we agree with the Army Court of Military Review that "[t]he issue" of admissibility in the present case "resolves into a question of whether the First Sergeant's listening to the conversation was in the ordinary course of business." *United States v. Sturdivant, supra* at 925. On this issue, the court below observed:

> The First Sergeant's responsibility reaches almost every facet of his unit's

---

8. *See* paras. 2 and 2a, Appendix to AR 20–3 (November 1977). *See also* para. 1–9, Monitoring of telecommunication services, AR 105–23; para. IVB4, DOD Directive 4640.1, Telephone Monitoring (3 Sep. 1969).

9. During appellant's court-martial, "[t]he prosecution and the defense stipulated that a command investigation had been conducted into whether the First Sergeant's action in listening to ... [Sturdivant's] conversation amounted to a violation of the Appendix to Army Regulation 20–3 (Wiretap, Investigative, Monitoring and Eavesdrop Activities (WIMEA) Information), and ... the Chief of Staff of the installation had concluded that there was a violation." *United States v. Sturdivant,* 9 M.J. 923, 926 n.2 (A.C.M.R.1980). However, that administrative determination was not binding on the military judge.

10. Headquarters, Department of the Army Message, 251700Z, August 1980, Subject: Monitoring and Recording Conversations, paras. 1 and 2.

11. In this context, "business" is interpreted broadly and includes activity of the armed forces. *Cf.* Mil.R.Evid. 803(6).

12. Likewise, if the first sergeant had been an "investigative or law enforcement officer" and was listening to the telephone conversation "in the ordinary course of his duties," there would have been no use of an "electronic, mechanical, or other device," and hence no interception. 18 U.S.C. § 2510(5)(a)(ii).

operation. He has the duty to insure that the orderly room is run properly and that includes the duty to insure that the battery phones are used primarily for official business. Their use for personal calls must be minimized. This requires him to listen to conversations on the phones. Even more important, the First Sergeant had duties and responsibilities regarding the welfare and discipline of the members of his unit. When he heard what appeared to be the planning of criminal activity that would adversely affect his unit he would have been remiss if he had not listened and acted on that information.

*Id.* at 926.

Although to some extent we agree with these observations, the statement that the responsibility of the first sergeant "requires him to listen to conversations on the phones" is too broad. It suggests that by reason of his position a first sergeant has almost unrestricted license to eavesdrop on a telephone extension when some member of his unit is carrying on a conversation. To the contrary, we believe that such eavesdropping usually does not fall within the statutory exception for listening in on an extension telephone "in the ordinary course of . . . [the listener's] business."

The parties agreed that Sturdivant's first sergeant initially picked up the extension telephone to learn who was being called. Where there are several extensions, it is quite customary that when a caller rings, persons will pick up the receivers at different extensions to determine if the call is for them or for others in their immediate area. Absent some contrary indication in this case that all calls were to be answered at only one extension, the first sergeant's act in picking up the phone must be considered to fall within the customary use of the telephone extension. Moreover, some period of listening would be necessary to determine to whom the caller wished to speak; so during the first few seconds while he was listening, the first sergeant had not "intercepted" any conversation. However, after he had determined that the call was not for

him and a pause ensued while appellant was being summoned to the phone, was the first sergeant still using the extension "in the ordinary course of . . . business"?

In this connection, we observe that the interval involved was very short; the extension was part of a military telephone system used primarily for official purposes; the first sergeant previously had warned his troops that personal calls should be no more than two minutes in length; and therefore they must have anticipated that occasionally the first sergeant or others would pick up an extension phone to assure that the line was being kept available for official calls. These circumstances indicate to us that here the first sergeant was still using the extension in the ordinary course of his business when he overheard Sturdivant. Moreover, an analogy exists to the "plain view" doctrine whereunder law enforcement officials lawfully performing a search who inadvertently come across contraband may proceed to seize it. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The brief remarks of PFC Baskerville, the CQ runner, made it appear likely to the first sergeant that appellant would be on the line immediately to discuss a drug transaction. For him to remain on the line briefly in order to determine if Sturdivant would be talking about drugs—and, if so, to continue listening to the conversation—is so foreseeable a result of the earlier events that it, too, should be considered "in the ordinary course of . . . business" of the Army and of the first sergeant. Thus, the evidence was admissible, because Sturdivant's telephone conversation was never "intercepted" within the meaning of 18 U.S.C. § 2510(4).

### III

Some leeway is allowed to a draftsman of charges, so that he may deal with exigencies of proof. *See* paras. 26*b*, 74*b*(4), and 76*a*(5), Manual, *supra*. However, "[o]ne transaction, or what is substantially one transaction, should not be made the basis for an unreasonable multiplication of charges against one person." Para. 26*b*,

*supra.* In *United States v. Middleton,* 12 U.S.C.M.A. 54, 58–59, 30 C.M.R. 54, 58–59 (1960), our Court commented:

> Ordinarily, it is not prejudicial to the accused to allow the court-martial to return a finding on each of the multiplicious charges, if the separately alleged charges are not made the basis for separate punishment. In other words, unreasonable multiplication of charges usually raises a question affecting the sentence, not the findings. *United States v. Posnick,* 8 U.S.C.M.A. 201, 24 C.M.R. 11. This is not to say that unreasonable multiplication may never affect the findings. The exaggeration of a single offense into many seemingly separate crimes may, in a particular case, create the impression that the accused is a "bad character" and thereby lead the court-martial to resolve against him doubt created by the evidence.

*See United States v. Haywood,* 6 M.J. 604 (A.C.M.R.1978).

■ In the case at bar, the Court of Military Review recognized that the charges were multiplicious, dismissed some of the charges on which appellant had been convicted, and substantially reduced the sentence. We are convinced, however, that further relief is required because of the "unreasonable multiplication of charges."

Appellant's sentence to a dishonorable discharge and confinement for 3 years undoubtedly reflects the effect of the multiplication of charges—which convinced the court members that appellant was a "bad character" who deserved severe punishment, even though he had only been convicted of a single marihuana transaction. *Cf. United States v. Gibson,* 11 M.J. 435 (C.M.A.1981). Moreover, in view of the weakness of the evidence—as described in the concurring and dissenting opinion of one member of the court below—this case presents the unusual situation adverted to in *Middleton* where "exaggeration of a single offense into many seemingly separate crimes" has helped induce "the court-martial to resolve against him doubt created by the evidence." If there is ever to be a case in which we set aside findings of guilt because of "unreasonable multiplication of charges," this is it.[13]

## IV

Accordingly, the decision of the United States Army Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The charges are dismissed.[14]

Judges COOK and FLETCHER concur.

**13.** The Government propped up its weak case with extensive evidence from Specialist Four Berry that on several previous occasions appellant had purchased drugs from him on pay day. Even if we assume that, despite its highly prejudicial effect, this evidence of prior uncharged misconduct was admissible, its reception in evidence is added reason to resolve in appellant's favor any question as to whether he was prejudiced by the violation of paragraph 26*b* of the Manual, *supra.*

**14.** In light of the conclusion we have reached, it is unnecessary to discuss the other granted issues.