UNITED STATES, Appellee

v

SANDERS D. MIDDLETON, Jʀ., Captain,

U. S. Army, Appellant

12 USCMA 54, 30 CMR 54

No. 13,995

Decided December 9, 1960

*Raymond Watkins, Esquire,* and *Lieutenant Colonel Ralph Herrod* argued the cause for Appellant, Accused.

*First Lieutenant Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. Mc-Conaughy, Major John G. Lovrien, First Lieutenant Harvey L. Zuckman, First Lieutenant James L. Green, First Lieutenant Allen I. Saeks,* and *First Lieutenant George H. Parsons.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused and sentenced him to dismissal and forfeiture of all pay and allowances. The conviction was affirmed by a board of review, and the accused appealed to this Court for a further review.

The background facts may be briefly summarized. In August 1957, Major Robert H. Phillips was assigned as S-3 of the First Airborne Battle Group, 501st Infantry. The accused was the Assistant S-3. Substantial differences arose between them. The Group Executive Officer attributed these, in part, to the accused's "personality complex" and "lack of loyalty" to Major Phillips. According to the accused, however, the differences arose from the Major's own personal problems; the accused's refusal to co-sign a note for him; and a "run in" between Mrs. Middleton and the Major's wife, in which the latter represented that she would see to it the accused received a low efficiency rating from the Major. Whatever the reasons, the differences were reflected in an efficiency report prepared by Major Phillips for the period from August 1, 1957, to January 21, 1958. The report was submitted prior

to Major Phillips' departure to an overseas station. Among other things, Major Phillips said the accused had undesirable qualities, including the habit of "passing on gossip," and "making mis-statements to attempt to gain advantages to himself or to put others in a bad light." He rated the accused's overall value to the service as merely satisfactory, but he noted that if the accused could correct his undesirable habits he "would be an excellent officer."

Major Phillips signed the efficiency report on January 21, 1958. It was signed by Lieutenant Colonel R. P. Zeigler, Group Executive Officer, as indorsing officer, and reviewed by the Group Commander on February 4. On the same day the report was sent to the accused for comment or "reclama," before its submission to the Division Adjutant General. On February 8, by first indorsement to the forwarding letter, the accused took issue with many parts of Major Phillips' rating, and he submitted statements from senior company commanders and others to support his position.

Besides his official reply, the accused took other action. He prepared a false efficiency report for the period of August 1, 1957, to December 21,

1957. In it, he rated himself a "superior officer of great value to the service." He traced Major Phillips' name on it, as the rating officer, and the name of the former Deputy Commander, as indorsing officer. He forwarded the false report to the Department of the Army. According to the accused's testimony at the trial, he sent the report about ten days after his reclama, "knowing . . . that when the two reports" were received by the Department "an investigation would start," and Major Phillips would be required to "justify his remarks" on the efficiency report, before his departure overseas. However, from a pretrial statement admitted into evidence for the prosecution, it would appear that the accused typed the report on a machine in a different section and that he sent in the false report before he knew of the rating by Major Phillips. Thus, he said,

> "After hearing rumors that I was going to get a low efficiency report, verifying some of the things I had heard about Major Phillips through working with him, I felt trapped by circumstances that had nothing to do with my job or efficiency. I attempted to counter the low one by rendering one myself. I procured a form from Unit Personnel Office and went to Post Training Aids Section and asked Mr. Bibbs to use his typewriter. I also asked him to get a lamp and glass so I could trace the signatures from some papers I had. After I finished it, I mailed it to Washington, D. C.

> "Being a deeply religious man, and the son of an ordained minister, I have suffered untold agony for this unwise act. I am glad to get this out in the open. At that time, I was unaware of the steps necessary to combat a threat to my efficiency by a wife who completely dominated her husband."

The Adjutant General's Office of the Department of the Army received the false report on February 21, 1958. It was accepted, and filed, as the official efficiency report. On March 13, 1958, the true report was received.

Eventually, an investigation was started and charges were filed against the accused. Charge I alleged that, with the intent to deceive, the accused submitted a false official report in violation of Article 107, Uniform Code of Military Justice. Charge II alleged a violation of Article 134 of the Uniform Code, in that he violated Section 1001, Title 18, United States Code, by knowingly submitting the false efficiency report in a matter within the jurisdiction of the Department of the Army. Two specifications were set out under Charge III as conduct unbecoming an officer and gentleman, in violation of Article 133 of the Uniform Code. The first specification alleged the accused "dishonorably and with the intent to deceive" made and submitted the false official report; the second charged that he wrongfully and dishonorably violated Section 1001, Title 18, United States Code, by making and submitting the false report in a matter within the jurisdiction of the Department of the Army.

At trial, defense counsel moved to dismiss all charges. Although the argument was principally directed against purported deficiencies in the Article 32 investigation, it included a claim that there was a "deliberate, unreasonable and calculated multiplicity of charges and specifications" which misled the convening authority as to the seriousness of the accused's conduct, and influenced him in his decision to refer the matter to a general court-martial for trial. Trial counsel maintained that each specification alleged a different "ultimate crime," and, at least for the purpose of "standing trial," the proof of each was separate. He further argued that at that stage of the proceedings, "potential multiplicity as to sentence" was immaterial. The motion was denied.

For his initial assignment of error, the accused reasserts the "calculated multiplicity" contention ■■■■■■■ ■ made at the trial level. Although not specifically articulated, the contention has a double aspect. First, it raises a question of the reason for drafting the specifications in the number and form

in which they appear. If the specifications were alleged for the purpose of deliberately exaggerating the accused's wrong so as to mislead the convening authority as to its seriousness, there might be a grave question of perversion of the court-martial processes. Cf. United States v Wille, 9 USCMA 623, 625–627, 26 CMR 403. No evidence of deliberate deceit, other than the charge sheet, was offered at the trial. While the number of charges might provide the basis for an inference of deliberate multiplication, those in this case are not so numerous and so patently duplicative as to establish the allegation. Since there is insufficient evidence to support a finding of calculated exaggeration, and since trial counsel's representations to the law officer indicate an honest and legitimate purpose for setting out the specifications separately in the form in which they appear in the charge sheet, this aspect of the claim of error must be resolved against the accused.

The second aspect of the attack on the number and relationship of the specifications is that the ■ rule against unreasonable multiplication was violated. Manual for Courts-Martial, United States, 1951, paragraph 26b. As early as United States v Keith, 1 USCMA 442, 4 CMR 34, we held that "a multiplication of charges arising out of the same transaction is frowned on in military law." We have also pointed out that, on timely objection, it is appropriate to dismiss a charge which merely duplicates another. United States v Drexler, 9 USCMA 405, 408, 26 CMR 185; United States v Strand, 6 USCMA 297, 306, 20 CMR 13. At the same time, we have noted that the Government can charge the same criminal act in different ways in order to meet exigencies of proof. United States v Drexler, supra. Even if the rule applies, obviously dismissal of one or two of several charges on the ground of unreasonable multiplication does not justify dismissal of all charges. Consequently, the trial motion for dismissal of all charges was too broad. Appellate defense counsel,

however, maintain the motion should have been granted to the extent that there is actual duplication; accordingly, they ask that Charges II and III be dismissed as unreasonable duplications of Charge I.

At the trial it was assumed that the several specifications alleged but a single punishable offense. ■ Thus, the law officer instructed the court-martial that the maximum sentence included confinement at hard labor for five years. If each offense is separate, the maximum confinement would extend to twelve years; one year, for Charge I; five years for Charge II; one year for specification 1, Charge III; and five years for specification 2, Charge III. See Manual for Courts-Martial, United States, 1951, paragraph 126d, page 208; paragraph 127c, pages 214, 222; 18 USC § 1001. The law officer's instruction, therefore, indicates that he regarded the charges as multiplicious. Since the Government interposed no objection to the instruction, it would appear that it also considered them duplicative. It certainly would have been appropriate for the law officer to dismiss some of the charges at the time he concluded they were multiplicious. See United States v Littlepage, 10 USCMA 245, 247, 27 CMR 319. What is the consequence of his failure to do so?

Ordinarily, it is not prejudicial to the accused to allow the court-martial to return a finding on each ■ of the multiplicious ■ charges, if the separately ■ alleged charges are not made the basis for separate punishment. In other words, unreasonable multiplication of charges usually raises a question affecting the sentence, not the findings. United States v Posnick, 8 USCMA 201, 24 CMR 11. This is not to say that unreasonable multiplication may never affect the findings. The exaggeration of a single offense into many seemingly separate crimes may, in a particular case, create the impression that the accused is a "bad character" and thereby lead the court-martial to resolve against him doubt created by the evi-

dence. No such contention, however, is made in this case, and the record of trial does not present any such risk. The Government established, and the accused judicially admitted, all the essential facts, except one, required to prove the charges; the exception was the accused's intent to deceive. That issue was present in each of the specifications. Consequently, it was impossible for the court to reach first a finding of guilty on one or more of the multiplicious charges which could cause it to decide against the accused an essential element in another of the charges, merely because the findings already reached showed him to be a "bad character." Thus, if the accused was prejudiced by denial of the motion to dismiss, the prejudice was confined to the sentence.

We have already pointed out that the law officer limited the court-martial to what he apparently considered to be the maximum punishment for the most serious of the offenses found. If his instruction was correct, it would have effectively eliminated all possibility of prejudice resulting from his denial of the motion to dismiss. United States v French, 10 USCMA 171, 180, 27 CMR 245; United States v Wells, 9 USCMA 509, 514, 26 CMR 289; cf. United States v Littlepage, 10 USCMA 245, 248, 27 CMR 319. That brings us then to the accused's second claim of error in which he alleges that the law officer's instruction is incorrect.

Section 1001, Title 18, United States Code, imposes a penalty which includes imprisonment for five years. However, court-martial punishment is based upon violations of the Uniform Code of Military Justice; and the limits of the punishment cannot exceed those prescribed by the Uniform Code and the President of the United States. United States v Varnadore, 9 USCMA 471, 473, 26 CMR 251. Paragraph 127c of the Manual for Courts-Martial, United States, 1951, provides that the punishment for an offense is that prescribed in the Table of Maximum Punishments. The Table lists one-year con-

finement for a false official statement made in violation of Article 107. Violations of Title 18 are cognizable in military law as violations of Article 134 of the Uniform Code. No specific punishment, however, is prescribed for a violation of Section 1001, Title 18, as an offense under Article 134. Accordingly, the unlisted offense is punishable to the same extent as a "closely related" offense which is listed. Manual for Courts-Martial, supra, paragraph 127c, page 214. United States v Cramer, 8 USCMA 221, 24 CMR 31. See also United States v Blevens, 5 USCMA 480, 18 CMR 104. The language and the purpose of Article 107 and Section 1001 unmistakably stamp the two provisions as "closely related." See United States v Hutchins, 5 USCMA 422, 18 CMR 46. Consequently, the punishment prescribed for Article 107 is controlling. This result was specifically contemplated by Judge Latimer in his concurring opinion in United States v Young, 9 USCMA 452, 26 CMR 232. He there said, "I have grave doubts that the punishment for a violation of Section 1001, properly pleaded under Article 134, supra, could exceed that imposable for making a false official statement under Article 107 of the Code." We hold, therefore, that the punishment for a violation of Section 1001, laid as an offense under Article 134, is limited to confinement for one year. That conclusion still leaves open the question of whether the several charges are separately punishable. Here, the law officer was correct. The evidence required to prove the matters alleged in one specification is the same as that required to prove the others, especially those laid under Article 133. See United States v Rosen, 9 USCMA 175, 25 CMR 437; United States v Posnick, 8 USCMA 201, 24 CMR 11. The maximum punishment, therefore, included confinement for only one year.

Error being present, we are faced with the problem of the nature of the relief to which the accused is entitled. The Government contends he is entitled to no relief. It argues that

**59**

since no confinement was adjudged by the court-martial it is sheer speculation to suppose it was adversely influenced by the instructional error. Support for this argument is sought in our opinion in United States v Thorpe, 9 USCMA 705, 26 CMR 485. That case is not in point. There, the court-martial was properly instructed on the maximum period of confinement, but the staff judge advocate misstated the period in his post-trial advice to the convening authority. The term was two years but he said it was four. However, no confinement had been adjudged by the court-martial. The problem before us was whether the staff judge advocate's error misled the convening authority to the accused's prejudice. We pointed out that because the adjudged sentence did not include confinement, the staff judge advocate "confined his discussion of the sentence to the question of whether the accused was disqualified for further military service." (Emphasis supplied.) We concluded that it was apparent from the review "that neither he nor the convening authority . . . was concerned with the period of confinement as such." Here, the period of confinement was one of the essential matters for the court-martial's consideration. The great disparity between the permissible period of confinement and the period instructed upon, and the relative shortness of the former, present a fair risk that the error influenced the court-martial's decision. The same circumstances indicate that a rehearing on the sentence should be had in the interest of justice. United States v Oakley, 7 USCMA 733, 23 CMR 197; cf. United States v Green, 9 USCMA 728, 26 CMR 508.

The accused's remaining assignment of error deals with the power of the board of review to substitute an administrative type of discharge for the dismissal adjudged by the court-martial. We considered the substance of this issue in United States v Phipps, 12 USCMA 14, 30 CMR 14. We there held that a court-martial had no power to adjudge a discharge other than bad-conduct or dishonorable. The reasons that led to that holding support the conclusion that, while the board of review can disapprove a bad-conduct or dishonorable discharge in its entirety or lessen its rigor (see United States v Russo, 11 USCMA 352, 29 CMR 168), it has no power to direct the accused's separation from the service by way of an administrative type of discharge. See United States v Plummer, 12 USCMA 18, 30 CMR 18.

The decision of the board of review as to the sentence is set aside. A rehearing thereof is directed.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with my associates that the findings of guilt should be sustained and that a board of review may not direct separation from the service by administrative discharge. However, for reasons which will hereinafter appear, I differ from them on their reversal of the sentence.

After findings of guilt had been returned the law officer instructed the court on the maximum sentence imposable. In doing so he treated the alleged offenses as a single crime for the purposes of punishment, and he used five years as the maximum period of confinement. The court was familiar with the allegations of the specifications, which pleaded the same criminal transaction in different ways, and the evidence established one transgression. With that background it is clear the members were apprised that the sentence was not to be based on a series of different offenses. The accused was represented by individually selected civilian counsel and appointed military counsel and, when the law officer had completed his charge on the sentence, he asked if the defense had any requests or objection to his instruction, and they announced there were none. Not only did they fail to challenge the stated period of imprisonment, but their arguments were directed principally toward convincing the court-martial that confine-

60

ment should not be imposed. They met with considerable success, for the sentence did not include incarceration. Accordingly, pretermitting any failure on the part of counsel to raise any question at the trial level, and assuming the court-martial was misinformed, I fail to find any possible prejudice stemming from any error which affected only the period of confinement. To hold otherwise is to overlook the obvious fact that the court members, in assessing the appropriateness of sentence, concluded that separation from the service was the only penalty which should be imposed. See Articles 57 and 71, Uniform Code of Military Justice, 10 USC §§ 857 and 871, respectively.

Accordingly, I would affirm the decision of the board of review.