**UNITED STATES**

v.

**Calvin A. HOWARD, Seaman, U.S. Coast Guard.**

**CGCM 9993.**
**Docket No. 890.**

U.S. Coast Guard Court of Military Review.

21 Aug. 1987.

Trial Counsel and Appellate Government Counsel: LT Andrew M. Hochberg, USCGR.

Assistant Trial Counsel: LT Kathleen M. Curley, USCGR.

Detailed Defense Counsel and Appellate Defense Counsel: LT Francis B. Orlando, USCGR.

Assistant Defense Counsel: LT David M. Shippert, USCGR.

## DECISION

GRACE, Judge:

The accused was charged with five violations totaling 319 specifications under the Uniform Code of Military Justice (UCMJ). He was convicted by a court with members of four charges and 193 specifications. He was sentenced to a bad conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for 17 months and reduction to the lowest pay grade. The convening authority approved the entire sentence.[1]

Seaman Calvin Howard was charged with taking a public record with the intent to alter it on 63 occasions and with altering a public record on one occasion (Charge I, violation of Art. 134, UCMJ, 10 U.S.C. § 934); with making a false official statement on 64 different occasions by preparing and submitting a procurement request (brown sheet) that was false in that it was made out to procure materials not needed by the Coast Guard (Charge II, violation of Art. 107, UCMJ, 10 U.S.C. § 907); with larceny by wrongfully obtaining cash from the possession of the United States on 64 different occasions (Charge III, violation of Art. 121, UCMJ, 10 U.S.C. § 921); with forging SF 1165, cash subvouchers, on 64 different occasions, by signing the names of fictitious salesmen which would indicate that they had received cash from the United States (Charge IV, violation of Art. 123, UCMJ, 10 U.S.C. § 923); and with presenting a false claim by presenting the forged SF 1165's on 64 different occasions in order to close out the procurement file which in turn prevented the earlier larceny from being discovered (Charge V, violation of Art. 132, UCMJ, 10 U.S.C. § 932).

Stated simply, it was alleged that the appellant pulled packing slips or other invoices from the files of the office where he worked and used them to make up brown sheets requesting procurement of the items listed on the packing slip. The brown sheet was then approved and used by the appellant as the documentation necessary to get an SF 1165, cash subvoucher. This form was used to obtain cash from the cashier which in the ordinary course of business would have been used to purchase, from a vendor, the items listed on the brown sheet. In this case, it was alleged that the appellant kept the cash and forged the name of a salesman on the SF 1165. Then by altering a copy of the original packing slip to show receipt of the items on that date, the appellant allegedly turned in the altered packing slip and the forged SF 1165 to close out the procurement action.

The appellant's first two assignments of error will be discussed together.

---

1. We note that Court-Martial Order 1–86, dated 13 June 1986, incorrectly states the date of sentencing as 14 December 1984. That incorrect date was also carried over on the referral of the case to this Court. Those errors should be corrected by appropriate authority.

## I

IT WAS ERROR FOR THE MILITARY JUDGE TO RULE THAT THE CHARGES AND SPECIFICATIONS WERE NOT MULTIPLICIOUS FOR FINDINGS AND SENTENCING.

## II

IT WAS ERROR FOR THE MILITARY JUDGE TO WAIT UNTIL AFTER FINDINGS TO RULE ON THE ISSUE OF MULTIPLICIOUS CHARGES AND SPECIFICATIONS

Multiplicity is a concept of law that has been long misunderstood. Even with the guidance provided by higher appellate courts, including the United States Supreme Court, the lower courts still have difficulty resolving issues of multiplicity. The leading military case addressing this issue is *United States v. Baker*, 14 M.J. 361 (C.M.A.1983). *Baker* analyzed and applied the leading Supreme Court case on this issue (*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)), but also went on to apply the Manual for Courts-Martial, 1984 (MCM) provisions to the issue of multiplicity and establish certain tests to be applied when analyzing this issue.

There are three different stages of trial when the issue of multiplicity may be raised; at pleadings, findings, and sentencing.

### A. PLEADINGS

The accused is entitled to know, with some specificity, what charges he is facing. Otherwise, he could face double jeopardy by being charged later with additional offenses based on the facts of the original charges.

Another "well-established limitation on the power of the prosecutor is that he cannot, for the purpose of influencing the jury, charge a single offense in several counts." *Baker, supra* at 365. He must also avoid the situation where a single criminal offense is exaggerated "into many seemingly separate crimes [which] may, in a particular case, create the impression that the accused is a 'bad character' and thereby lead the court-martial to resolve against him doubt created by the evidence." *United States v. Middleton*, 12 USCMA 54, 58, 59, 30 C.M.R. 54, 58, 59 (1960). "There are times, however, when sufficient doubt as to the facts or the law exists to warrant making one transaction the basis for charging two or more offenses." Rules for Courts-Martial (RCM) 307(c)(4) (discussion following the rule).

 When the defense moves, before pleadings, to dismiss certain charges and specifications due to multiplicity, the defense has the burden of persuasion. The military judge must decide the issue based on the charges and specifications as drafted, viewing them in the light most favorable to the prosecution since no evidence will have been presented on the factual allegations therein. The military judge must also carefully examine the charges and specifications for lesser-included offenses. The test to be applied is the one enunciated by the Supreme Court in *Blockburger*,

> Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

*Blockburger, supra*, 52 S.Ct. at 182.

The Court of Military Appeals in *Baker* further explained the tests to be applied when examining for lesser-included offenses.

> First, where one offense contains only elements of, but not all the elements of the other offense; second, where one offense contains different elements as a matter of law from the other offense, but these different elements are fairly embraced in the factual allegations of the other offense and established by evidence introduced at trial.

*Baker, supra*, at 368.

In the case at hand, each and every charge has elements that the others do not

have. None contains only the elements of, but not all of the elements of, one of the other charges. By the first test none of the charges stand in a greater-to-lesser offense relationship. The second test cannot be applied at pleadings, but must await application until all the evidence is in.

■ The test that this court must apply in reviewing the military judge's ruling on the issue of multiplicity at the pleadings stage of the trial is one of abuse of discretion. "In those rare instances in which this discretion is abused to such a shocking extent that due process of law has been infringed, no test would stand in the way of remedial action." *Baker, supra,* at 376 (Judge Cook's dissent).

■ This was a case with a complicated fact pattern. The government had a heavy burden to overcome in presenting its case because of the number of witnesses and documents required to prove its case. Many exigencies of proof existed concerning the weight that the court members would give the government's evidence and which elements of which offenses would be proven by the evidence introduced. The military judge did not abuse his discretion by not dismissing any of the charges or specifications before pleadings in this case.

## B. FINDINGS

■ Over 40 witnesses were called and hundreds of documents were introduced into evidence. It is clear from the military judge's instructions to the court members on findings that he recognized that there were questions of fact that the court members had to resolve. The military judge instructed the members to determine whether the false official statements alleged under Charge II were the false pretenses upon which larcenies by false pretense were perpetrated. These instructions charged the members with two duties; to evaluate all of the evidence and determine if each and every element of each specification was proven beyond a reasonable doubt and then to look at the specifications sufficiently proven in relation to each other. If the members found that the false official statements were the means by which the appellant accomplished the larcenies by false pretenses they were instructed to make a finding of not guilty as to the specifications alleging false official statements (Charge II). This is exactly what the members did. They found the appellant not guilty of all 64 specifications under Charge II (false official statements) and guilty of 63 of the 64 specifications under Charge III (larceny). This shows that the members either found that the government had failed in its proof of false official statements or, more likely, that the false official statements were the means by which the appellant committed the larcenies.

As to Charges III and V, the military judge instructed the members that if they found the appellant guilty of larceny by false pretenses under a specification of Charge III and if they found that the false pretenses under Charge III to be the same false and fraudulent statements in a corresponding specification of Charge V, presenting a false claim, they could not reach guilty findings as to both corresponding specifications. The offenses merged and they were to select the offense that most accurately reflected their findings. The members returned findings of guilty of specifications under Charges III and V. This indicates that the members found, as a matter of fact, that the false pretenses in the larcenies (Charge III) were not the false and fraudulent statements by which the offenses alleged in Charge V were committed. Because these were questions of what evidence the members believed and the weight that was given to that evidence, it was properly put before the members for findings.

If the military judge had dismissed Charge II or Charge III and the specifications thereunder prior to findings as requested by the defense, he would have invaded the province of the members' fact finding responsibility. The judge's recognition of the issue of multiplicity and his clear instructions to the court members adequately protected the appellant.

The appellant cites *United States v. Rodriquez,* 18 M.J. 363 (C.M.A.1984), *United States v. Timberlake,* 18 M.J. 371 (C.M.A.

1984), and *United States v. Sturdivant,* 13 M.J. 323 (C.M.A.1982) for the proposition that the military judge should have dismissed some of the charges and specifications before findings. The appellant's reliance on these cases is misplaced. In *Rodriquez,* the Court held that the offense laid under Charge I, a violation of Art. 134, UCMJ, was a lesser-included offense of the offense charged in Charge II, a violation of Art. 133, UCMJ, 10 U.S.C. § 933. That holding was based on an analysis of the evidence produced in the trial. The Court found that:

> To convict appellant of the Article 134 offenses, the Government was required to show her conduct was under the circumstances prejudicial to good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. To convict appellant of the Article 133 offenses, the Government was required to show that the same conduct was unbecoming an officer and gentlewoman. In view of the military judge's instructions defining these elements of proof and the traditional relationship of these offenses as a matter of military law, we have little difficulty in concluding that the disorder or discredit element of Charge I is necessarily included within the element of disgrace required by Charge II. The fact that the same evidence was used to establish both types of offenses confirms our conclusion.

*Rodriquez, supra,* at 369 (footnote omitted).

Likewise, in *Timberlake* the Court found the forgery charge to be a lesser-included offense of the conduct unbecoming an officer.

> The only substantial difference between these two offenses is that the Article 133 offense required the Government to show that appellant's acts under the circumstances of this case constituted conduct unbecoming an officer.... The conduct must not only be shown to dishonor the individual but also seriously compromise his standing as an officer.... This element of proof is not required to be pleaded and proven under Article 123(2). However, this single ele-

ment of proof is not sufficient to render these offenses separate under the aforementioned *Blockburger* test. On the contrary, the above analysis of the elements of these offenses in this case clearly establishes that the forgery offense here required no proof beyond that which was required for the offense of conduct unbecoming an officer by committing forgery.... In the absence of a clearly expressed legislative intent to the contrary, the lesser offense must be dismissed.

*Timberlake, supra,* at 375.

In both of these cases the military judge probably could have dismissed one of the charges during pleadings as a lesser-included offense of the other offense. But rather, the judge allowed the government to present proof on the merits on both charges. The Court of Military Appeals held that once the evidence was in, the proof clearly established that one offense was a lesser-included offense of the other and that the lesser-included offense should have been dismissed. We do not read these cases to require dismissal of a lesser-included offense *before* findings if there are reasonable exigencies of proof that must be resolved by the fact finders.

In *Sturdivant, supra,* one marijuana transaction was multiplied into ten different charges. The Court held that some leeway is allowed the draftsman of charges to deal with exigencies of proof. Normally multiplicity only affects sentence, not findings. In that case, there were no exigencies of proof and the charges were unreasonably multiplied which, the court found, led to a harsher sentence for what was one transaction.

■ Although the two pronged *Baker* test is met in this case, in that the specifications contain separate elements and the facts show that, except for Charge II and Charge III, separate transactions were involved, we must still consider whether, as argued by the appellant, the sheer number of the separate allegations of criminal conduct led the members to consider the accused a bad person and to resolve any

doubts against him. *United States v. Middleton, supra.* In another case this might cause us grave concern; here, however, the findings of the members demonstrate that they carefully matched the evidence against the individual specifications and did not hesitate to modify their findings by exceptions and substitutions or to return findings of not guilty where the evidence was found lacking. We are convinced that their decision was not influenced by the number of charges and specifications and that any doubt was properly resolved in favor of the accused.

In the case before us, there were exigencies of proof that the military judge clearly recognized and on which he carefully instructed the court members. The members verdict demonstrates that they understood the judge's instructions and followed them. Accordingly, appellant's assignment of error II is rejected in its entirety as well as that portion of assignment I relating to multiplicity for findings.

### C. SENTENCING

■ Once findings were returned by the members and the exigencies of proof faced by the prosecution had been resolved, the military judge then had to determine if the charges and specifications were multiplicious for sentencing purposes. At this point in the trial, the standard for determining multiplicity eases to the favor of the appellant. Before findings, a specification may be allowed to stand where there is a doubt whether or not the offenses are indivisible, as a matter of law or where the Government has convinced the judge that exigencies of proof exist. *Baker, supra,* at 367. In *United States v. Hollimon,* 16 M.J. 164 (C.M.A.1983) the appellant was convicted of rape and communicating a threat. The Court of Military Appeals held that "although this former offense [communicating a threat] could properly have been charged separately because of possible exigencies of proof, the separate finding of guilt rendered thereon should be set aside." *Id.* at 167.

The judge must look again at the offenses remaining and apply the second part of the lesser-included offense test cited earlier from *Baker:* "[W]here one offense contains different elements as a matter of law from the other offense, but these different elements are fairly embraced in the factual allegations of the other offense and established by evidence introduced at trial." *Baker, supra,* at 368.

In addition, the discussion following RCM 907(b)(3) states, "Ordinarily, a specification should not be dismissed for multiplicity before trial unless it clearly alleges the same offense, or one necessarily included therein, as is alleged in another specification. It may be appropriate to dismiss the less serious specification of any multiplicious specifications after findings have been reached."

We will now examine the various ways in which the military judge could have approached sentencing in this case, including the one he actually used. To understand the nature of the appellant's criminal activity an overview of the pattern of his behavior is helpful. He was convicted of committing offenses over a period from 7 June 1983 to 25 June 1984. He committed these offenses on multiple occasions during each month of that period, except for the months of October 1983 and January 1984 when he committed the offenses only once during each of those months. Based on this pattern of behavior, we discern five different ways in which the military judge could have instructed on sentencing in this case.

#### Option 1

The military judge could have ruled that, for purposes of sentencing, this was a single scheme or plan carried out over a period of months and instructed the court members to consider all of the charges and specifications remaining as a single charge of larceny with a single specification. The maximum sentence would have been five years confinement plus other authorized punishments.

#### Option 2

The proof revealed that the appellant engaged in a scheme to steal money from the United States and to prevent his crime from being detected. When we examine

the evidence in the present case, it is clear that the appellant used his false brown sheets in Charge II to accomplish the larcenies in Charge III, and so the court members found when they made "Not Guilty" findings as to Charge II. Also, the evidence reveals that the appellant used the forgeries in Charge IV and the public records taken and altered in Charge I to close out the procurement action by submitting the false claim in Charge V. Therefore, the military judge could have dismissed Charges I and IV and the specifications thereunder, as multiplicious with Charge V for sentencing purposes. Then he could have considered the commission of the larceny over a period of months as a single punishable offense and the attempt to cover the crime also a single continuing transaction, which would have left two charges and a single specification under each charge for a maximum punishment of 10 years confinement. This is the approach urged by the appellant.

### Option 3

Another option for handling this issue was the one applied by the military judge in this case. The military judge instructed the court members that for the purposes of sentencing, they were to consider all of the specifications under any charge as a single offense. Since the appellant had been found guilty of four charges and the specifications thereunder, the judge instructed the members that the maximum sentence of confinement they could adjudge was 18 years (three years for Charge I, Art. 134 and five each for violations of Articles 121, 123, and 132).

### Option 4

Next the military judge could have consolidated all of the remaining charges into one charge of larceny with 63 specifications, finding that all of the charges represented a single plan, but that the plan was repeated over and over. The approach is logical, but would result in having an accused face over 300 years confinement as possible punishment for what amounted to the nonviolent theft of $13,000.

### Option 5

The military judge could just as easily have ruled that each time the appellant obtained cash by false pretenses and each time he presented a false claim it was a separate offense. This would have left Charge III with 63 specifications thereunder and Charge V with 57 specifications thereunder. Applying the analysis, the accused would have faced a maximum period of confinement of over 600 years.

Although options 4 and 5 yield results which might be considered to be extremely harsh, they have support in case law. In *United States v. Harrison*, 4 M.J. 332 (C.M.A.1978) an agent cashier was convicted of wrongful appropriation of money from funds he was accountable for, and the signing of false balance sheets to prevent the detection of the shortage. The Court held that the military judge had not erred by rejecting a defense contention that the six specifications of signing false official records were multiplicious with each other and with the offense of wrongful appropriation. After a review of the various tests for multiplicity espoused in earlier cases the Court stated: "[I]t is clear that no one test can be applied to the exclusion of all others.... [E]ach case must be analyzed within its own factual context." *Id.* at 334, citations omitted. The Court noted:

Each improper withdrawal of funds was complete upon the commission of the act with the requisite intent. Each false balance sheet enabled the appellant to avoid detection, but the false nature of the record was not a medium for the withdrawal of the funds. Thus, there were separate transactions which were clearly motivated by different impulses or intents. Under such circumstances, we are convinced that the fundamental principle of avoiding duplicate punishment for the same offense will not be violated by holding that the offense of wrongful appropriation is not multiplicious with the offense of signing a false official record to prevent discovery of the offense.

*Id.*

Turning to the six specifications of signing false balance sheets over a period of slightly less than a year, the Court stated:

Each report was single and complete for the cash on hand on the day of submission. That the same process of concealment was used on different days did not transmogrify the several transactions into a single wrong. In other words, a *modus operandi* does not integrate a series of crimes into one punishable offense.

*Id.*

These principles fit the case at hand and are not contrary to the analysis of *Blockburger v. United States,* or *United States v. Baker,* both *supra.* The larceny offenses were complete, in each instance, when the money was received from the agent cashier. At this point the taking of the packing slips was not necessary, since the information they contained, which was entered on the procurement requests and cash subvoucher, could have been obtained by simply viewing the files. The forging of salesmen's signatures on the cash subvoucher and presenting them to close out the file, along with altered packing slips and invoices, occurred after the larceny was complete and was done with the intent to conceal the larceny. Although demonstrating a *modus operandi,* each specification of each charge was a separate offense. Thus we could hold that, although the military judge erred in instructing the court that they were to consider four separate charges with a single specification for each charge, there was no prejudice to the accused since the court was advised that the maximum punishment included confinement for 18 years instead of the more than 600 years that the above analysis would support.

Options 1, 2, and 3 appear to offer more reasonable limitations on the maximum punishment that could be imposed. However, adopting the principle that, in cases where the same *modus operandi* is applied in repeated instances, all specifications alleging this conduct are to be merged into one for sentencing purposes, removes any deterrent for repeated criminal acts. Once a plan is formed and the offense committed, an accused would face the same maximum penalty no matter how many times he repeated the offense. Obviously, fairness and a sense of justice dictate that this result should not apply in those cases where there was a different victim in each instance, in cases involving acts of violence against the same victim, or in cases involving the destruction of property. Should a separate rule be crafted for non-violent white collar crimes against a single victim? If such a rule were adopted, should the appellate courts look to intermediate issues, such as the involvement of different innocent third parties, to create exceptions and maintain offenses separate for sentencing purposes? *See United States v. Barnum,* 24 M.J. 729 (A.C.M.R.1987).

The "fairly embraced" concept of *United States v. Baker, supra,* or the "integral means" of accomplishing the ultimate offense, as enunciated in *United States v. Hollimon, supra,* and *United States v. Watson,* 21 M.J. 96 (C.M.A.1985), as applied to these offenses, could require the consolidation of Charges I and IV with Charge V or all three into Charge III. The consolidation of Charges I, IV, and V is more compelling, since in order to successfully present a false claim in the manner alleged, the packing slips and invoices would have to be taken and altered and the SF 1165's forged to show receipt of payment. We also find persuasive the reasoning of Judge Fletcher's dissent in *Harrison, supra,* that, despite the fact that the taking of the packing slips occurred before obtaining the funds, and the altered documents were presented at a later time, they were integral parts of the larceny. However, we would be constrained to follow the majority decision in that case were we to attempt to so narrowly resolve the issue before us. We elect not to undertake this narrow approach.

Our review of the case law leaves us with no clear path to take to a determination, as a matter of law, of a single acceptable method of treating these offenses as multiplicious. We subscribe wholeheartedly to the observation of our brethren on the Army Court of Military Review:

Although military 'legal purists' may wince at the thought, it appears that our current military rules of multiplicity are

a curious blend of military due process, equity, and policy considerations. Somehow, through this maze, our appellate courts, with the help of an overall enlightened 'field' legal practice, are basically reaching fundamentally fair dispositions of multiplicity issues.

*United States v. Barnum, supra* note 3, at 731.

■ The record of this case indicates that the military judge carefully considered the issue of multiplicity, carefully instructed the court members on multiplicity for sentencing, and that the results did not deny the appellant due process of law and in fact were fair and reasonable as applied to the appellant. We, therefore, find no merit to appellant's asserted error relating to multiplicity for sentencing.

The appellant's third assignment of error is as follows:

### III

IT WAS ERROR FOR THE MILITARY JUDGE NOT TO ADMIT EVIDENCE OF AN EXCULPATING [sic] POLYGRAPH

■ The Court of Military Appeals recently examined the question of the admissibility of polygraph evidence under the UCMJ after the 1984 changes. *United States v. Gipson,* 24 M.J. 246 (C.M.A.1987) involved the issue of whether the results of a polygraph examination were inadmissible in a court-martial as a matter of law. The appellant moved *in limine* to admit evidence of an exculpatory polygraph examination. The prosecution opposed any attempt by the defense to lay a foundation to show that polygraph examinations are or should be accepted as evidence in a trial by court-martial. The Court said:

A few courts have experimented with the notion that an accused has an independent, constitutional right to present favorable polygraph evidence. We do not subscribe to this theory of admissibility because there can be no right to present evidence—however much it purports to exonerate an accused—unless it is shown to be relevant and helpful. When evidence meets these criteria, no additional justification for admissibility is necessary.

*Id.* at 252 (footnote omitted).

The Court concluded that "[W]e do not suggest that all polygraph evidence is admissible or that this particular evidence should have been admitted. Appellant still bears the burden of establishing the foundational predicates outlined above. Our holding here is only that appellant was entitled to attempt to lay that foundation." *Id.* at 253 (footnote omitted).

In the instant case the military judge did not rule that the evidence of the appellant's polygraph examination was inadmissible as a matter of law, but rather he allowed the appellant to attempt to lay a foundation for the admission of the polygraph and then ruled on the admissibility of the polygraph evidence pursuant to the Military Rules of Evidence.

Military law no longer contains an absolute bar to evidence and expert testimony relating to a polygraph test, Rule 702, MRE, Analysis, MCM 1984. The explicit prohibition against polygraph evidence previously found in Paragraph 142(e), MCM (1969 Rev.) has been removed from the 1984 MCM. "The Rule's sole explicit test is whether the evidence in question 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Whether any particular piece of evidence comes within the test is normally a matter within the military judge's discretion." Rule 702, MRE, Analysis, MCM 1984.

In stating his essential findings of fact, the military judge found that the proffered polygraph evidence did not meet threshold tests for admissibility, in that the helpfulness test under MRE 702 had not been met and that the danger of confusion and misleading the members tipped the MRE 403 balance toward exclusion of the evidence. The judge found that "there are at least eight variables in application of a proper polygraph examination technique. There were no controls or checks over the techniques used in this case." Record of Trial (ROT) at 2324. Later he stated:

[T]he way the questions are phrased is important to the test and the question involving use of a receipt to obtain cash from the Cash Cage was ambiguous and could have affected the conclusions of Mr. Kaufman and Dr. Yankee in scoring the tests.... I am not satisfied as to the soundness and reliability of the polygraph process and I have concluded that admitting polygraph evidence would confuse or mislead the members.

ROT at 2325.

He also found "the great number of variables present in the methodology as testified to by Dr. Yankee and the lack of controls thereon, led me to conclude that a reliable scientific basis for polygraph evidence had not been established." ROT at 2326. The judge reviewed MREs 401, 402, 403, 702, and 704 and concluded that "the helpfulness test under MRE 702 is not met and that under MRE 403 confusion would be created and the Members would be misled." ROT at 2327.

We find that the judge's ruling denying the admission of appellant's polygraph examination, offered to support the accused's testimony on the merits, was a legally sound ruling in accord with the Military Rules of Evidence. Moreover, it comports with Court of Military Appeals guidelines that were subsequently set out in *U.S. v. Gipson, supra.* Accordingly, assignment of error III is deemed to be without merit, as is the remaining assignment of error.

We are convinced by the evidence of appellant's guilt beyond a reasonable doubt, despite appellant's testimony denying guilt, which we find not credible.

In light of the foregoing discussion, the findings of guilty and sentence as approved below are affirmed.

Judges BRIDGMAN and BURGESS concur.

BAUM, Chief Judge (concurring):

I join with both Judge Grace and Judge Josephson in their treatment of the issues raised and the ultimate decision with respect to findings and sentence. I write separately to address a distinctly different matter—appellate representation. In this case, appellate counsel for the accused and the government are the same attorneys who functioned at the trial level as defense counsel and prosecution. Both officers at the time of trial were permanently assigned to the district legal office, Third Coast Guard District, Governors Island, New York and were detailed respectively as defense counsel and trial counsel by the Third Coast Guard District Legal Officer.[1] When the record of trial was referred to this Court for review under Article 66, Uniform Code of Military Justice by the Chief Counsel for the Coast Guard, the letter effecting that referral also designated these same officers as appellate counsel.[2] Separate letters from the Commandant to each of these attorneys, signed by the

---

1. The letters detailing these officers cite as authority for this action R.C.M. 503(c), Manual for Courts-Martial, 1984 and COMDTNOTE 5810 dtd 2 AUG 84 (ALDIST 167/84). The Manual for Courts-Martial provision states that trial and defense counsel shall be detailed in accordance with regulations of the Secretary concerned. The COMDTNOTE of 2 AUG 84, which presumably constitutes the Secretarial regulation in this regard, promulgates an interim revision to the Coast Guard Military Justice Manual authorizing detail of trial and defense counsel by district legal officers. The current Coast Guard Military Justice Manual (Commandant Instruction M5810.1A) was issued on 10 April 1985 and continues that authority in Sections 301 and 302, setting out further particulars with respect to the detailing of counsel. The promulgating letter for the Manual is signed by the Coast Guard Chief Counsel and states in the first paragraph that:

This Manual prescribes regulations of the Secretary of the Department of Transportation, rules, and instructions for the administration of military justice in the U.S. Coast Guard based upon and supplemental to the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1984.

2. The functions of the Judge Advocate General of referring cases to this Court for review and detailing appellate counsel before this Court, pursuant to Articles 66(b) and 70(a), Uniform Code of Military Justice, have been expressly delegated to the Chief Counsel of the Coast Guard by the General Counsel, Department of Transportation, who is the Judge Advocate General of the Coast Guard. *See* Article 1(1) Uniform Code of Military Justice and 49 C.F.R. Part 1, Appendix A.

Chief Counsel for the Coast Guard and filed with the Court, reiterate their detailing as appellate counsel. At that time, these officers were still permanently attached to the Third Coast Guard District, but each had received message orders from the Commandant of the Coast Guard, copies of which have been filed with the Court and are now part of the record, assigning them temporary additional duty as follows:

1. SUBJECT NAMED OFFICER HEREBY ASSIGNED DETACHED TEMPORARY ADDITIONAL DUTY AT CURRENT LOCATION TO COAST GUARD HEADQUARTERS, OFFICE OF CHIEF COUNSEL, MILITARY JUSTICE DIVISION FOR DETAIL AS APPELLATE COUNSEL, DURATION APPROXIMATELY 3 MONTHS. TEMPORARY ADDITIONAL DUTY TO BE ACCOMPLISHED CONCURRENT WITH PRESENT DUTIES.

2. NO ACCOUNTING DATA PROVIDED SINCE IT APPEARS THIS ORDER CAN BE EXECUTED WITHOUT COSTS. IF COSTS WILL ACCRUE, SUBJECT NAMED OFFICER MUST REQUEST AND RECEIVE PRIOR AUTHORITY INCLUDING ACCOUNTING DATA FROM COMMANDANT (G–L).[3]

According to affidavits of appellate representation filed with the Court by appellate defense counsel and appellate Government counsel, each officer was on active duty in the Legal Office at the Third Coast Guard District on the date the affidavits were subscribed. Moreover, the assignment of errors and brief submitted by appellate defense counsel and the Government response were both mailed to the Court from New York and the legal stationery for both documents are imprinted with a Third Coast Guard District Legal Office address. Presumably, any costs as-

sociated with these briefs were born by the district legal office. The record does not reflect whether additional costs were needed in the fulfillment of counsel's appellate responsibilities or whether prior authority for accruing such costs was ever sought, as required by the message orders. As far as the Court knows, counsel never traveled from New York to Washington, D.C. where the Court of Military Review and the Office of Chief Counsel are both located. Accordingly, it appears that counsel were physically located in the Third Coast Guard District Legal Office when detailed as appellate advocates and that they performed all duties while physically remaining in the District Legal Office, Third Coast Guard District.

Given these facts, I question whether appointment of appellate counsel in this case was in conformity with the terms of Article 70(a) of the Uniform Code of Military Justice. That article provides for appellate counsel as follows:

"(a) The Judge Advocate General shall detail in his office one or more commissioned officers as appellate Government counsel, and one or more commissioned officers as appellate defense counsel, who are qualified under section 827(b)(1) of this title (article 27(b)(1))."

Article 70(a), Uniform Code of Military Justice.

In my view the officers assigned to represent the accused and the Government were never in the Office of Chief Counsel and, therefore, were not properly detailed as appellate counsel. Furthermore, it is my judgment that, as a general policy, appointment of military trial advocates as appellate counsel in the same case violates the intent of Congress, as explicated in *United States v. Patterson*, 22 USCMA 157, 46

**3.** The foregoing is an unabbreviated version of the following message:

1. SNO HEREBY ASSIGNED DETACHED TEMADD AT CURRENT LOCATION TO CG HEADQUARTERS, OFFICE OF CHIEF COUNSEL. MILITARY JUSTICE DIVISION FOR DETAIL AS APPELLATE COUNSEL DUR APPROX 3 MOS. TEMADD TO BE ACCOMPLISHED CONCURRENT WITH PRESENT DUTIES.

2. NO ACCTING DATA PROVIDED SINCE IT APPEARS THIS ORDER CAN BE EXECUTED WITHOUT COSTS. IF COSTS WILL ACCRUE, SNO MUST REQ AND RECEIVE PRIOR AUTH INCLUDING ACCTING DATA FM COMDT (G–L).

Article 4–A–17 of the U.S. Coast Guard Personnel Manual (COMDTINST M1000.6) has been utilized along with appropriate punctuation to clarify the literal text of this message.

CMR 157 (1973) and reiterated in *United States v. Kelker*, 4 M.J. 323 (C.M.A.1978).

In *United States v. Patterson, supra,* the Court of Military Appeals, after looking at the legislative history of Article 70, concluded that, "[t]he solution Congress provided was the establishment within the office of the Judge Advocate General of a group of qualified lawyers to function as appellate defense counsel." *Id.* at 161. The Court also went on to state that:

In addition to the wording of Article 70(a) of the Code, which refers to the Judge Advocate General's detailing in his office qualified lawyers to function as appellate defense counsel, other sections of the Code substantiate construction of Article 70 to mean that Congress contemplated designation of military appellate defense counsel different from trial [defense] counsel.

*United States v. Patterson, supra* at 161. This view was repeated in *United States v. Kelker, supra,* when the Court stated: "*Patterson* recognized the separability of the trial and appellate functions.... that Articles 38 and 70 contemplate that appellate defense counsel would be different from trial defense counsel." *Id.* at 325. These cases lead me to conclude that the appellate counsel appointments in the instant case were neither in accord with the explicit terms of Article 70, Uniform Code of Military Justice nor the intent of Congress in passing this legislation.

The Court in *Patterson, supra,* did opine, however, that an accused's request for representation at the appellate level by trial defense counsel possibly could be accommodated by assignment of that officer temporarily to the Office of the Judge Advocate General. *Id.* at 158 and 159. If this passage in the *Patterson* opinion prompted the action taken in the instant case then reliance on such authority was, in my opinion, misplaced. There is no indication in the record before us that appellant requested representation by his trial defense counsel and, as already indicated, that officer was never physically transferred to the Office of Chief Counsel. I, therefore, find it difficult to justify the procedure followed in this case on the dictum in *Patterson, supra,* relating to requested counsel.

If the appellate counsel appointment process with which we are confronted is accepted as within the terms of the Uniform Code of Military Justice, then there would be no need, whatsoever, to detail counsel from among those attorneys assigned, in fact, to the Office of the Chief Counsel and performing duties there. Appellate counsel in every case could be drawn from the various district legal offices all over the country simply by use of the device employed in this case. I do not think that is what Congress contemplated nor is it, in my view, what the Court of Military Appeals has envisioned.[4] In order to comply with the Uniform Code of Military Justice, I believe that commissioned officers who are qualified under Article 27(b)(1) of the Code must be assigned to the Office of Chief Counsel for regular tours of duty in sufficient number to satisfy whatever requirements for appellate representation may arise. The substitute procedure utilized here, in my opinion, constituted error.

Having found a deficiency in the counsel appointment process, I look now to the effect of this error. *Wright v. United States,* 2 M.J. 9 (C.M.A.1976) is instructive in this regard. In that case no jurisdictional defect was found to have resulted from the appointment of a general court-martial trial counsel not qualified under Article 27, Uniform Code of Military Justice. The Court of Military Appeals in *Wright, supra,* said that,

"Because we do not view counsel as an integral part of the adjudicating tribunal known as a court-martial, the jurisdictional existence of which requires that it be properly convened and constituted, we conclude that the error presented is not

---

**4.** *See, United States v. Grostefon,* 12 M.J. 431, 436 (C.M.A.1982), where the Court stated, "[w]e must recognize the dichotomy of counsel in the military system occasioned by the fact that trial defense counsel may be anywhere in the world and appellate defense counsel are clustered in Washington, D.C."

of jurisdictional magnitude." (Footnote omitted).

*Id.* at 2 M.J. 10

The Court went on to say in *Wright, supra,* that,

"Defects in the appointment of trial counsel, Article 27(a), UCMJ, or in the qualifications of trial counsel, Article 27(b), UCMJ, are matters of procedure to be tested for prejudice. Article 59(a), UCMJ."

*Id.* at 2 M.J. 11.

I believe the approach taken by the Court of Military Appeals with regard to a defective appointment of counsel at the trial level applies equally with respect to a similar deficiency at the appellate level. Accordingly, I find no jurisdictional error and would test, instead, for prejudice from the erroneous detailing of the trial counsel and defense counsel as appellate government and appellate defense counsel. After reviewing the record in conjunction with the assignments of error and briefs submitted by counsel, I discern no prejudice to the accused and find that the accused was adequately represented at the appellate level.

The fact that prejudice has not been found in this particular case should not be considered as an indication that errors of this kind are to be treated lightly. Careful scrutiny for prejudice will continue to be given whenever the Court is confronted with similarly appointed appellate counsel.[5] The importance of qualified, diligent and conflict free representation at the appellate level cannot be overemphasized. *United States v. Ortiz,* 24 M.J. 323 (C.M.A.1987), *United States v. Sumpter,* 22 M.J. 33 (C.M.A.1986), *United States v. Hullum,* 15 M.J. 261 (C.M.A.1983), *United States v. Grostefon, supra, United States v. Palenius,* 2 M.J. 86 (C.M.A.1977), *United States v. Patterson, supra, United States v. Bell,* 11 USCMA 306, 29 CMR 122 (1960).

JOSEPHSON, Judge (concurring):

I concur with Judge Grace's opinion and approval of the findings and sentence in this case. I also concur with Chief Judge Baum's opinion on the issue of appellate representation. I write separately to express additional views on the matter of multiplicity.

The military judge instructed the members that the maximum sentence of confinement they could adjudge was 18 years. The law of sentencing in this case, therefore, started with a reasonably comprehensible cap. I do not view that factor, however, as determinative of this Court's approval of the sentence.

I am not as troubled with the lengthy periods of confinement included within the "maximum" punishments imposable under some of the options which the Court discusses. Lengthy "maximum" periods of confinement in complicated factual scenarios such as that presented by the instant record are a function of the "maximum" punishments prescribed in the Manual for Courts Martial, diverse and/or repetitive acts of misconduct, and judicial perceptions of the law of multiplicity.

In my view the primary focus of appellate review of the sentence in circumstances such as those in the instant case should be on the quantum of sentence adjudged. I recognize the possibly insidious influence that sizable "maximum" punishments may have on sentence deliberations. Yet, I am reluctant to categorically conclude that because particular circumstances may lead to a seemingly large "maximum" punishment, it is then necessary to engage in possibly tortuous reasoning and analysis in an attempt to construe certain acts or repetitions of misconduct in a way that is more favorable to the accused in terms of a lesser "maximum" imposable punishment. It may be that this type of result-oriented analysis has, at least partially, contributed to the complexity of the law of multiplicity for sentencing purposes. Efforts to pro-

5. This Court has already taken steps in two other cases, *United States v. Roach,* CGCM 9992, Court Order of 8 August 1986 and *United States v. Slocumb,* CGCMS 23850, Court Order of 29 August 1986, to avert possible prejudice from the appointment through the same process of trial defense counsel as appellate defense counsel.

vide bright-line guidance in this area may only further complicate the issue. Rules seemingly appropriate in certain factual scenarios may lead to incongruities in other factual circumstances.

Just as the conduct which leads to guilty findings in complicated and/or repetitive factual scenarios (and which may result in a large "maximum" punishment) is ultimately the responsibility of the accused, so too is it the accused's responsibility to convince the Court, and subsequent reviewing and appellate authorities, that the same conduct or other circumstances warrant a relatively lenient sentence in comparison to the "maximum" imposable sentence. Needless to say, it is also incumbent upon the government to seek a *fair* and appropriate sentence.

The military judge may, in the first instance, also exercise some practical restraint on sentence determinations in such cases. This may be done either by limiting the "maximum" imposable sentence by a relatively restrictive view of the nature of the misconduct (as was done in this case), or by appropriate instructions and cautionary guidance, at the accused's request or *sua sponte*, in those cases where, in the abstract, the "maximum" imposable punishment seems disproportionate to the nature of the misconduct. The approved sentence in this case would, in my view, have been equally supportable, legally and factually, under either of these alternatives.

Ultimately, military appellate courts have the authority and the responsibility to review and disapprove excessive sentences. Their review, on a case-by-case basis, serves roughly to harmonize the sentencing process in the military justice system with respect to the broad spectrum of types and seriousness of criminal conduct. Justice, equity, professional conscience and common sense may be better barometers of sentence appropriateness than individual or collective judicial preferences among several "maximum" sentence options resulting from different interpretations of the law of multiplicity for sentencing.