UNITED STATES, Appellee

v.

JAMES P. HUTCHINS, Sr., Major, U. S. Army, Appellant

5 USCMA 422, 18 CMR 46

No. 4945

Decided January 21, 1955

MAJ Edwin Doran, U. S. Army, CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Leslie D. Scharf, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, LT COL William R. Ward, U. S. Army, and MAJ Merle C. Rideout, Jr., U. S. Army, for Appellee.

ROBERT E. QUINN, Chief Judge:

On review of the accused's conviction for several offenses, the reviewing authority set aside all findings of guilt, except those of making a false official statement, in violation of Article 107, Uniform Code of Military Justice, 50 USC § 701. The findings on the approved offense were modified. The sentence to dismissal, imposed by the court, was approved. On appeal, a board of review affirmed. We granted further review to consider the following questions:

"1. Whether the false official statement was required to be material to the issue under inquiry.

"2. If the answer to the first issue is in the affirmative, whether the evidence is sufficient to support the finding of Charge I.

"3. Whether the trial counsel prejudiced the accused by improper and inflammatory statements in closing argument."

During a field training exercise in September 1953, the accused served as the Division Liaison Officer to Corps. At the conclusion of the exercise, in the early evening of September 13, he was relieved from duty by Corps. He proceeded by jeep, driven by Corporal Grout, his assigned driver, to the service company's bivouac area. On arrival, he pointed out a parking place for the vehicle, and informed Grout that they would stay there that night. Shortly afterward, Grout advised the accused that he had neglected to apprise him of a portion of the last message received in the exercise. The accused directed Grout and a Private First Class Samuels to deliver the message to Division Headquarters. Later, the accused and a number of enlisted men went to drink beer in the nearby town of Bernshausen. Parenthetically, it should be noted that one of the charges against the accused alleged that he knowingly entered an off-limits town; he was also convicted of this charge by the court, but that conviction was set aside by the convening authority. In about an hour, Grout and Samuels appeared at the house to which the group had gone, and talked to the accused. Grout then left. Between an hour and an hour and one-half later, he was killed when the jeep in which he was driving overturned. The accident occurred on a road about 300 yards from the house, in a direction "away" from the bivouac area.

In due course, Major R. A. Facko was appointed investigating officer to determine Grout's line-of-duty status at the time of his death. He interviewed the accused. After being warned of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, the accused submitted a sworn statement. In part, he said:

"On 13 September 1953 . . . I stopped at the Bivouac area . . . which was in the immediate vicinity of . . . Bernshausen; I stopped here in anticipation of returning to Home Station with this unit. Here, I selected a specific location in the area and informed Cpl Grout that we would spend the night here and to make preparations accordingly. I did not give Cpl Grout either expressed or implied permission to move the vehicle from that spot nor did I give him permission to leave the bivouac area. From the experience of working with this man for the previous week and considering his grade, I did not deem it essential to tell him in detail that he could or could not do this or that and I fully expected him to prepare to retire."

Over defense objection, Major Facko testified that on the basis of the accused's statement, and certain other evidence concerning the presence of unauthorized persons in the vehicle at the time of the accident, he determined and officially reported that Corporal Grout's death "was not in the line of duty due to his own misconduct."

Testifying in his own behalf, the accused admitted that, after arriving at the bivouac area, he ordered Grout and Samuels to deliver the message to Division. He also stated that about 30 to 40 minutes later, Corporal Grout came to the house in the village to re-

423

port "mission accomplished." On receiving the report, the accused asked about the jeep. Being informed that it was "outside," he told Grout to "take it back to the spot he had shown him." About one and one-half hours later, intending to retire for the night, he returned to the bivouac area. Since his equipment was still in the vehicle, he went to the place he had previously designated to Corporal Grout. The vehicle was not there. On looking around the area and not finding the jeep, he became "concerned." He returned to the village. Arriving at the house, he was accosted by a civilian who excitedly informed him that an American was "kaput." He followed the civilian to the scene of the accident. He denied any intent to deceive "anybody" in the line-of-duty investigation by failing to mention Grout's mission to Division. On cross-examination, he explained the failure as follows:

"I figured that it was not important to the case, and I figured that it was not only incriminating to myself but the other people too."

Defense counsel's closing argument stressed the accused's contention that the omission of the message incident from his statement was unimportant to the line-of-duty investigation. Emphasizing the accused's order to Corporal Grout to return the jeep to the spot in the bivouac area which he had previously designated, he argued:

"There can be no doubt in the minds of reasonable men that nothing the Major may have said in his statement was said with intent to deceive Major Facko in that material issue: was that last trip authorized?"

In his own closing argument, trial counsel disputed the defense counsel's contention of immateriality. He said:

"May it please the court, as to the statement that Major Hutchins had not given Corporal Grout permission to leave the battalion area. There is a difference in the two statements made in the line-of-duty investigation. The first one clearly was to the effect that Corporal Grout was not given permission to leave the area at all from the time he entered it until

the time of the accident. That would clearly indicate to the investigator that he was not only AWOL but had misapprehended a vehicle at the same time. *When the true facts came out we found out that he was on an authorized trip that evening, and the accident had happened on his way back to camp,* the witness stated it was on a road near the Stein home, in sort of a triangle to the road to camp. He could have been on his way back to camp at the time of the accident. That is the materiality of this allegation and the facts proved. As to a person protecting himself under Article 31—that article gives a person the right to say nothing if he so chooses, but it cannot be depended upon if you do make a statement after having been advised of the article. You cannot tell a falsehood. You cannot fall back on Article 31, because you don't want to incriminate yourself once having agreed to making a certain statement. There has been a long line of cases showing that knowing that you make a false statement, the intent may be inferred from that. *In addition, to that, the dependents of the deceased carry the stigma of having their loved one branded as having been killed not in the line of duty.*" [Italics supplied.]

No objection as such was made to trial counsel's argument. However, defense counsel sought and was granted permission to make a further statement. In part, he said:

"The prosecution has appealed to the prejudice of the court by saying that because the Major made these statements, it is possible that the dependents of Corporal Grout may be injured or carry a stigma because of the unfortunate death of the man."

Following the law officer's instructions on the law, the court was in closed-session deliberation on the findings for one and one-half hours. On reopening, it asked to have the testimony of certain witnesses read. Then it recalled the accused and other witnesses and questioned them extensively about the events of that evening. When it finally returned a verdict, it had made certain

exceptions and substitutions in the false official statement charge.

The offense of which the accused is convicted is set out in Article 107 of the Uniform Code of Military Justice:

"Any person subject to this code who, with intent to deceive, signs any false record, return, regulation, order, or other official document, knowing the same to be false, or makes any other false official statement knowing the same to be false, shall be punished as a court-martial may direct."

The Code provision is briefly discussed in the Manual for Courts-Martial, United States, 1951, as follows (paragraph 186, pages 341–342):

"Official documents and official statements include all documents and statements made in the line of duty.

"The false representation must be made officially with the intent to deceive, and it must be one which the accused does not believe to be true. The relative rank of the person intended to be deceived is immaterial if that person was authorized in the execution of his office to require the statement or document from the accused. The expectation of material gain is not one of the essential elements of the offense.

"*Proof.*—(a) That the accused signed a certain official document or made a certain official statement, as alleged; (b) that the document or statement was false in certain particulars, as alleged; (c) that the accused knew it to be false at the time of signing or making it; and (d) that such false document or statement was made with the intent to deceive."

No question is presented on this appeal regarding the findings that the accused made a false statement in an official matter. It is argued, however, that falsity alone is insufficient to prove the charge. It is said that the falsity must be with regard to a material matter. Conversely, the Government maintains that the language of both the Article and the Manual condemns all false statements, regardless of materiality. Support for this contention is sought in United States v. Brumfield, 4 USCMA 404, 15 CMR 404; United States v. Cliette, 2 USCMA 240, 8 CMR 40. In both of those cases, the accused was convicted of a violation of Article 107. Neither opinion makes mention of materiality. The omission has no special significance. The point was not raised, and it was not important to the respective decisions. Consequently, the cases above referred to are not controlling.

The first part of Article 107, which deals with false documents, undoubtedly has its roots in Articles of War 56 and 57, 10 USC §§ 1528 and 1529, and Article 8(14) of the Articles for the Government of the Navy, 34 USC § 1200. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 264; Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on HR 2498, page 1230. These antecedent statutes prohibit the making or signing of a false muster, or the making of a false return of a specified kind. Plainly, the present Article of the Code is much broader in scope. It not only enumerates, as did the predecessor statutes, specified type of reports, but it delineates as an offense the making of "any other false official statement." It is contended that by this enlargement Congress gave legislative recognition to service cases holding a false official statement, of a kind not otherwise specified, to be a violation of the general articles, that is, Articles of War 95 and 96, 10 USC §§ 1567 and 1568, and Article 8(1) of the Articles for the Government of the Navy, 34 USC § 1200. On that premise, the accused relies upon a Navy case in which it was held that proof of materiality is essential to support a conviction for falsehood in violation of Article 8(1) of the Articles for the Government of the Navy. Minton, C. M. O. 10–1937, pages 4 and 5. Although the statement in the Minton case may have been dictum, it is nevertheless supported by the discussion of the offense in Naval Courts and Boards, 1937. The latter authority provided (page 24):

"54. *Falsehood.*—This is provided for under the 8th A. G. N., paragraph 1.

"*Charge:* Falsehood.

"*Elements:* The false representation must be made officially with intent to deceive, must be such as to deceive a reasonably prudent person and must be material and pertinent matter which the accused does not believe to be true, as to some past or existing fact or circumstance and not a mere expression of opinion or a promise or a frivolity. Equivocation or failure squarely to answer is not falsehood.

"The specification should include *direct and specific allegations* negativing the truth of the alleged false statements, together with affirmative averments setting up the truth by way of antithesis."

In opposing the accused's contentions, the Government relies upon Army cases which, in enumerating the elements of the offense as a violation of Articles of War 95 and 96, make no mention of materiality. Typical of these cases is United States v. Gaddis, 73 BR 181, in which the elements of the offense were delineated as they now appear in the Manual for Courts-Martial. Since the definition does not include an express reference to materiality, the Government concludes that materiality is unnecessary to support a conviction for that offense.

If the initial premise that Congress intended to incorporate previous service decisions into Article 107 is correct, and if the Army cases were as sharply at issue with the Navy view as the Government urges, the question would then arise as to whether Congress deliberately cast aside the Navy rule for that of the Army. Actually, however, we do not find the Army cases uniformly exclude materiality as a necessary requirement of proof. Certain Army opinions look to that requirement. Thus, the statement of an early case which holds a false official statement to be a violation of the then general article, Article of War 61, is digested in Digest of Opinions of the Judge Advocates General, 1912, as follows (page 141):

". . . So of any deliberately

false official statement, written or verbal, of a material character."

In United States v. Webster, 8 BR–JC 121, 132, the accused was convicted for falsely noting on his officer qualification card that he was authorized to practice law in a State court. In sustaining the conviction, the Judicial Council apparently considered it necessary to highlight the materiality of the misrepresentation. It there said:

". . . Accused by his act held out to his military superiors that he was qualified to perform duties in the Army beyond the scope of officers untrained in law, and presumably accused was assigned to such duties."

See also United States v. Hansen, 10 BR–JC 165, 175; United States v. Heindorf, 6 BR–JC 179, 195; United States v. Kelley, 4 BR–JC 319, 324.

Some further support for holding that the falsity must be in respect to a material fact may also be found in the general analogy between Article 107, supra, and section 1001, Title 18 of the United States Code. That section provides as follows:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes . . . any false, fictitious or fraudulent statement . . . shall be. . . ."

A number of the Federal courts have apparently regarded section 1001, and its direct predecessor, former section 80, Title 18, as requiring a showing of materiality to support a conviction. Cohen v. United States, 201 F2d 386, 393 (CA9th Cir 1953), cert den 345 US 951, 97 L ed 1374, 73 S Ct 864; Todorow v. United States, 173 F2d 439 (CA9th Cir 1949), cert den 337 US 925, 93 L ed 1733, 69 S Ct 1169; United States v. Marzani, 71 F Supp 615, 617–618, (DC), aff'd 168 F2d 133 (CA DC Cir), aff'd 335 US 895, 93 L ed 431, 69 S Ct 299, adhered to 336 US 922, 93 L ed 1084, 69 S Ct 653. The strongest and most direct statement appears in the Cohen case. There the accused was convicted of violating section 1001. He contended that the statute was not ap-

plicable to a statement submitted to an Internal Revenue agent because it was impliedly repealed by 26 USC § 3809. After distinguishing the two statutes and noting that section 3809 required falsity in all material respects, the court said:

"The Government had the burden of establishing only that the net worth statement given by the appellee to the Treasury agents on January 3, 1950, was false *in one material respect*." [Italics supplied.]

Some similarity of language in section 1001 and Article 107 is undeniably present. This would tend to favor acceptance of the construction accorded to section 1001. United States v. Taylor, 4 USCMA 232, 15 CMR 232. But there is also a difference in language which might require a difference in result. In section 1001 the word "fraudulent" is coupled with the words "false, fictitious" in the enumeration of prohibited statements. As was said by Judge Schwellenbach in United States v. Raymond, 37 F Supp 957, 958 (ED Wash):

"The rule is universally recognized that for a representation to be fraudulent it must be made concerning a material fact with knowledge of its falsity and with intent to deceive."

However, we need not consider the language variations and likenesses for the solution to the problem before us.

In United States v. Gilliland, 312 US 86, 93, 85 L ed 598, 61 S Ct 518, the Supreme Court of the United States held that the purpose of the false statement statute is "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." We think that also succinctly states the purpose of Article 107. On that basis, materiality is important, not as an essential ingredient of the proof required to support a conviction, but as it bears upon the intent to deceive. When a statement is shown to be false and to have been made with an intent to deceive in an official matter, the accused cannot escape the consequences of his known falsity by later attempting to minimize

the importance of his statement. This principle was emphasized by the United States Supreme Court in Kay v. United States, 303 US 1. In that case, the defendant was convicted of violating section 8(a) of the Home Owners' Loan Act of 1933, 12 USC § 1467, which provided for the punishment of any person who "makes any statement, knowing it to be false . . . for the purpose of influencing in any way the action of the Home Owners' Loan Corporation." Writing for a unanimous court, Mr. Chief Justice Hughes said (page 5):

". . . It does not lie with one knowingly making false statements with intent to mislead the officials of the corporation to say that the statements were not influential or the information not important. There can be no question that Congress was entitled to require that the information be given in good faith and not falsely with intent to mislead."

See also United States v. Eisler, 75 F Supp 634 (DC), aff'd 176 F2d 21 (CA DC Cir), cert den 337 US 958, 93 L ed 1757, 69 S Ct 1535.

We hold, therefore, that the Government is not required to show affirmatively that the false statement is material to the issue under inquiry in order to establish a violation of Article 107. Unquestionably, materiality has significance. But, its importance is in relation to the intent to deceive. If the falsity is in respect to a material matter, it may be considered by the court-martial as evidence of an intent to deceive. On the other hand, if the statement is false in an immaterial respect, the immateriality may tend to show the absence of such intent. The relationship is aptly noted in United States v. Welch, 56 BR 233, 239:

"These statements were all made with respect to a highly material phase of the matter under investigation. It is patent that they were made with the intent to deceive."

See also United States v. Bishop, 2 BR-JC 13, 17.

Turning to the accused's claim in

connection with trial counsel's closing argument, we may assume ▮▮▮ for the purposes of this case that although no regular objection was made, defense counsel preserved the point for appeal by arguing that trial counsel had "appealed to the prejudice of the court." The accused maintains that both of the underscored parts of trial counsel's argument were improper and prejudicial. It may well be argued that the first of the allegedly improper comments constitutes only a legitimate attempt to answer the defense argument that the statement was completely immaterial to the line-of-duty inquiry. See: Baker v. United States, 115 F2d 533 (CA8th Cir), cert den 312 US 692, 85 L ed 1128, 61 S Ct 711; Ochoa v. United States, 167 F2d 341 (CA9th Cir). However, we need not press the point. We agree that trial counsel's remark regarding Corporal Grout's dependents and the "stigma of having their loved one branded as having been killed not in line of duty" was improper. Cf. Beck v. United States, 33 F2d 107 (CA8th Cir). The record, however, clearly dispels any possibility that the court was unduly influenced by it.

Of its own initiative, the court interrupted its deliberations on the findings to recall the accused and a number of the Government witnesses. It conducted a searching examination to determine additional facts. Before the court had retired into closed session, it had been clearly established that the accused's statement to the line-of-duty investigator was false. The only possible question left for the court to determine was whether it had been made with intent to deceive. In its recall examination of the accused, the court questioned him very closely about his reasons for making the statement. In that examination, and in further questioning of disinterested witnesses, the court demonstrated conclusively that it was exclusively interested in the facts, and especially those relating to the intent to deceive. Consequently, we find no fair risk that the court was influenced in its findings by possible conjecture on the line-of-duty determination and the "stigma" attaching to it. We hold, therefore, that even though improper, trial counsel's closing comments were not prejudicial. United States v. Lotsch, 102 F2d 35 (CA2d Cir 1939), cert den 307 US 622, 83 L ed 1500, 59 S Ct 793.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

Judge LATIMER concurs in the result.