**UNITED STATES**

v.

**First Lieutenant Stafford R. GOLD-SMITH, 420–06–1323 FV, United States Air Force.**

**ACM 27775.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 10 May, 1989.

Decided 18 Jan. 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major Ronald G. Morgan.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Major Terry M. Petrie; Captain James C. Sinwell and Captain Joseph V. Treanor, III.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

DECISION

KASTL, Senior Judge:

The principal question before us is whether it constitutes a false official statement for an officer to lie to a civilian cashier at the Officers' Club who is inquiring about his account. To resolve that question—which we answer in the affirmative—it becomes necessary to analyze the law of false official statements under Article 107, UCMJ, 10 U.S.C. § 907.

*Factual Setting*

Lieutenant Goldsmith was found guilty, upon mixed pleas, of writing five bad checks with the intent to deceive [1] and making a false official statement, violations of Articles 123a and 107, UCMJ, 10 U.S.C. § 923a. He was sentenced by a military

---

1. The appellant pleaded guilty to the lesser included offense of failing to maintain sufficient funds, in violation of Article 134, UCMJ, 10 U.S.C. § 934, but was found guilty of the greater offense.

judge sitting alone to a dismissal and confinement for eight months.

In regard to the false statement offense, Lieutenant Goldsmith had a conversation with the head cashier at the F.E. Warren Air Force Base, Wyoming, Officers' Club concerning the return of Goldsmith's checks by his bank in December 1988 and January 1989. Around 20 January 1989, the lieutenant falsely told the cashier that he was unable to settle the account "because my car was stolen and all my checks and papers were in the car and the police told me the car was probably taken to Colorado."

The Officers' Club is a nonappropriated fund instrumentality; its role in the Air Force is detailed in Air Force Regulation 176-1, *Nonappropriated Funds—Basic Responsibilities, Policies, and Practices*, paragraphs 1-3, 1-4, 4-1b and 4-6 (4 March 1986). *See generally United States v. Brossman*, 16 C.M.R. 721 (A.F.B.R.1954), *pet. denied*, 16 C.M.R. 292 (C.M.A.1954) (what constitutes the transaction of "official business" *vis-a-vis* an Officers' Club).

At trial, the appellant moved to dismiss the Article 107 violation on the basis that it did not state a military offense because the statement in question was unofficial. The military judge denied the motion. This same matter has been advocated before us in both briefs and oral argument.

We hold that the military judge ruled correctly in denying the motion. We are satisfied that recent precedents compel such a result. *See United States v. Harrison*, 26 M.J. 474 (C.M.A.1988); *United States v. Jackson*, 26 M.J. 377 (C.M.A. 1988).

### False Official Statements

The appellant mounts a many-pronged attack on the military judge's ruling. In the main, his battle plan as to whether this was a false official statement centers on challenging the word *official*. He argues that: (a) he clearly was not performing regular duties at the time of his conversa-

tion with the cashier; and (b) the Officers' Club does not enjoy the status of an official governmental department or agency but is merely a recreational type organization. To these arguments, we might add a third: (c) while the Officers' Club might be "official," this label does not resolve whether the Club's contact *with the appellant* was official as well—in short, it is one thing to call the Officers' Club "official" but another to argue that everything its representatives do in relationship to the membership is "official."

We believe any doubts are squarely resolved by *Harrison* and *Jackson*. The latter case makes it clear that the Court of Military Appeals currently views the word "official" under Article 107 as virtually synonymous with the phrase "any matter within the jurisdiction of any department or agency of the United States" found in 18 U.S.C. § 1001 and interpreted by the courts; that section has been generously construed in favor of the Government in recent Federal precedents. *United States v. Jackson*, 26 M.J. at 378–379. Nor does *Harrison* provide anything to cheer the appellant: It suggests that the head cashier's questions can be viewed as official if they are "related to her job." *United States v. Harrison*, 26 M.J. at 476. Concededly, *Harrison* involves a guilty plea. However, we believe its rationale is equally persuasive in a contested case.

We recognize that not all the precedents can be logically harmonized. As one author has noted, historically the Government and appellants have argued two different concepts of the word "official".[2] Each position has advantages by way of simplicity and ease of application.

### A

The Government's thesis generally has been this: A falsehood by an officer or custodian on an official subject is punishable if the hearer is acting under some color of authority or duty imposed by law, regulation, or custom and the declarant has the

---

**2.** Abagis, "The False Official Statement: A Comparative Study of 18 U.S.C. 1001 and Article 107, Uniform Code of Military Justice," unpublished thesis, The Judge Advocate General's School, U.S. Army, Charlottesville, Va. (April 1961) pp. 15–16.

intent to deceive. This point of view gains strength from the recommendations contained in the Ad Hoc Committee Report on the Uniform Code of Military Justice, presented to the Secretary of the Army on 18 January 1960.

Through the years, numerous opinions on similar facts have provided support for the Government's position that the duties here were clearly "official."

In *United States v. Ragins,* 11 M.J. 42 (C.M.A.1981), the appellant signed false invoices indicating that bread had been delivered to the commissary on base; the Court of Military Appeals found his action a false official statement under Article 107. His unsuccessful defense was bottomed on the argument that the invoices were not "official" but only receipts given to the baking company.

In *United States v. Reams,* 9 U.S.C.M.A. 696, 26 C.M.R. 476 (1958), the appellant lied to both a judge advocate and to his commander that he had made a payment to a civilian creditor. The Court of Military Appeals found that both statements were made to individuals impersonally inquiring into a matter of official interest. It followed that the appellant's false statements that he had paid his debts were "official" and punishable under Article 107, UCMJ.

Finally, in *United States v. Torbett,* 17 C.M.R. 650 (A.F.B.R.1954), an Air Force major engaged in various conduct involving worthless checks. In response to an inquiry concerning his dishonored checks, he falsely advised the Commandant of the Air Command and Staff School that he had deposited a check for $700.00 into the account. The Air Force Board of Review found that the specification in question effectively stated the offense of making a false official statement under Article 107.

### B

The contrary point of view can be summarized as follows: (1) a fair reading of Article 107 makes it patently clear that Congress used two words to describe the offenses here—*false* and *official.* Of necessity, Congress must have recognized a category of some statements which were false yet "unofficial." (2) By the rule of *ejusdem generis,* the words "official statement" are limited to those possessing the common denominator that the declarant has an official duty to report. (3) Congress, by deliberately choosing the word "official," has refused to brand as criminal every false statement; to hold otherwise would be to gut the word "official" and disregard completely the basic rule of statutory construction that when a statute is plain, certain, and free of ambiguity, interpretation is unnecessary.

Thus, for example, in *United States v. Arthur,* 8 U.S.C.M.A. 210, 24 C.M.R. 20 (1957), an Air Force captain saw the accused hitting a woman; the accused refused to go with the captain, falsely saying he was an Air Policeman who was beyond the captain's authority. The Court held the accused's statement not official within the meaning of Article 107 since the captain was "not discharging the functions of a particular office" and nothing that the accused said "could possibly pervert the performance of a governmental operation."

A similar result was reached in *United States v. Cummings,* 3 M.J. 246 (C.M.A. 1977); the appellant falsely told a sergeant that he had obtained on-post insurance for his motorcycle. The Court held that the appellant could not be convicted under Article 107 because this sergeant had no specific responsibilities for enforcing vehicle registration.

In *United States v. Colby,* 25 C.M.R. 727 (N.B.R.1957), the appellant was interviewed by his commander in regard to nonpayment of a private debt. The Navy Board of Review found "officiality" in the interview between the accused and his commander "from the Government's point of view." *Id.* at 731. Nonetheless, regarding the "officiality" of this interview as to the appellant, "a different picture was presented."[3]

---

**3.** Here, the Navy Board of Review appears to be making the same distinction we advanced earlier in this opinion—calling the entity "official" does not inevitably resolve whether contact between the individual in question and that function is "official" too. For example, what if a

Such interview had no color of officiality since the accused had no obligation to respond; *ergo*, there was no official statement within the meaning of Article 107.

Finally, in the more recent case of *United States v. Lauderdale*, 19 M.J. 582 (N.M. C.M.R.1984), the Navy–Marine Corps Court of Military Review considered the contentions of an appellant assigned to duty at a Navy Relief Society office. The appellant had signed various Relief Society documents, and the question on appeal centered on whether they were "official." The Court held that there was no statutorily-mandated government function involved with the forms in question. The Navy Relief Society performs laudable work and receives Navy support of various sorts, the Court noted; yet its papers could not be considered official documents under Article 107.[4]

### "Official" versus "Official Duty to Report"

A crucial linchpin in any deeper analysis of this area is *United States v. Aronson*, 8 U.S.C.M.A. 525, 25 C.M.R. 29 (1957). The case involved an individual entrusted with money belonging to the Base Trailer Park Fund at Laughlin Air Force Base, Texas. The *Aronson* case is significant for two rulings which have withstood judicial scrutiny for over a quarter of a century. First, it provides firm and venerable support for the thesis that Article 107 violations substantially mirror those under 18 U.S.C. § 1001. *Id.* at 32. Second, it establishes the "official duty" dictum: Individuals can be found guilty of making a false official statement if they are entrusted with funds or specific duties; they then have a legal obligation to either claim Article 31, 10 U.S.C. § 831 or speak truthfully when questioned about them. *Id.* at 33.

However, there is a third and more difficult aspect of the case. The Court created a problem which has muddied the legal waters for some 30 years when it stated the obverse of the second rule: When a suspect *with no independent duty or accountability* lies to an investigator, the fact remains that the agent has no right or power to require the statement. Therefore: (a) from the accused's standpoint, the statement "has no officiality;" and (b) from the Government's point of view, the statement, though false, "is hardly calculated to pervert the function of the investigating agency"—if anything it will simply cause that agency to redouble efforts to ferret out the criminal. Accordingly,

> Whatever offenses the accused might commit by lying under these circumstances, his statement is not "official" within the meaning of Article 107.

*Id.* at 34.[5]

### Analysis by Commentators

We have sought—with only minimal success—to find some plausible theory which will make all the cases fit a logical, consistent pattern. Our efforts evaporate after a few moments' reflection like some legal Brigadoon. Our research has uncovered helpful materials not easily available to the field. Since the question of how widely one should read Article 107 will no doubt arise in the future, we will quickly survey these materials.

*Army Jag School Analysis.* An outline of instruction from The Judge Advocate General's School, US Army, Charlottesville, Va., dated October 1967, discusses the evolution of Article 107. Historically, Article 107 consolidates Articles of War 56 and 57, which dealt with false musters and false returns. As drafted, it was designed to create a new offense; there is nothing in its history to indicate that it is based in any way upon 18 U.S.C. § 1001. Originally, the Court of Military Appeals adhered to Congressional intent in such cases as *United*

---

club cashier finds an officer-member attractive; his false reply while cashing a check that he is a bachelor, an SR–71 pilot, or musically talented is likely not a false *official* statement.

**4.** *United States v. Azevedo*, 24 M.J. 559 (C.G.C.M. R.1987) appears squarely contrary, although the Coast Guard Court sought to distinguish *Lauderdale.*

**5.** This portion of *Aronson* appears to have been overruled a quarter of a century later. See the text at n. 8.

*States v. Cliette,* 2 U.S.C.M.A. 240, 243, 8 C.M.R. 40, 42 (1953). The erosive process began in *United States v. Hutchins,* 5 U.S. C.M.A. 422, 18 C.M.R. 46, 51 (1955), where the Court examined Article 107 in historical depth and suggested that the Article mirrored Section 1001 of Title 18. Erosion continued in earnest in *United States v. Arthur* and *United States v. Aronson,* both *supra. Aronson* is significant not so much for its holding as for its dictum that: (a) the law enforcement agent investigating an alleged offense has no power to require a statement from a non-accountable accused; and (b) the accused has no obligation whatsoever to give a statement. As a result, the statement has no officiality from the accused's standpoint—even though false! By the time of *United States v. Washington,* 9 U.S.C.M.A. 131, 133, 25 C.M.R. 393, 395 (1958), *Aronson's* dictum had become a holding. Though the Court in *Aronson* did not intend to grant individuals a license to lie, this seems to be the ultimate result. *See United States v. Osborne,* 9 U.S.C.M.A. 455, 26 C.M.R. 235 (1958). Due to the Court's tortured reading of Article 107, staff judge advocates were counselled to consider charging the accused with a violation of Article 134 for false swearing.

*Navy JAG Journal Article.* In *False Statements, An Accuser's Dilemma,* 20 Navy JAG Journal 123 (May–June 1966), Lieutenant Buhler analyzed Federal and military cases in depth. The Court of Military Appeals decisions have "created considerable confusion among the Boards of Review in regard to Article 107." In its key decision in *United States v. Aronson, supra,* the Court relied principally upon the Federal district court opinion in *United States v. Levin,* 133 F.Supp. 88 (D.C.Colo. 1953). However, *Levin* has been "almost unanimously rejected throughout the federal judicial system." Cases such as *United States v. Reams, supra,* were imprecise attempts to limit the maverick results of *Aronson;* however, the Court "should reassess the rationale of *United States v.*

*Aronson* and the subsequent decisions based thereon at the earliest possible opportunity."

*Army Thesis Paper.* Captain Abagis authored a lengthy paper for the Army JAG School entitled "The False Official Statement: A Comparative Study of 18 U.S.C. 1001 and Article 107, Uniform Code of Military Justice" in April 1961. He finds numerous "well reasoned" Federal decisions contrary to the Court of Military Appeals dictum/holding in *Aronson* that a conviction cannot be upheld when the individual interrogated has no duty or trusteeship as to the subject involved. To avoid *Aronson,* Article 134 (false statement under oath) was being used to supplant Article 107. A representative case is *United States v. Claypool,* 10 U.S.C.M.A. 302, 27 C.M.R. 376 (1959). In the Claypool-type situation, criminal investigators would swear all persons whom they questioned so that any false statements made under oath could be alleged as violations of Article 134, thereby finessing the difficulties inherent in *Aronson.*[6]

*Fordham Law Review Note.* The author in Note, *Judicial Reluctance to Enforce the Federal False Statement Statute in Investigatory Situations,* 51 Fordham L.Rev. 515 (December 1982), makes an ironic contribution to military practitioners seeking solid guidance for making Article 107 a carbon copy of 18 U.S.C. § 1001. He comments that there is no uniform way the Federal courts have interpreted 18 U.S.C. § 1001. Some courts refuse to convict because they reason it is essentially unfair to punish on the basis of everyday "fibs" told to low-level government employees; others will convict only if there is a final, binding determination by the agency involved; still others reason that 18 U.S.C. § 1001 was not intended to punish falsehoods told to those handling housekeeping or administrative functions of the Government.

### Application

■ We now apply this background and analysis to the present case. The Court of Military Appeals essentially resolved these

---

6. The Manual for Courts–Martial 1984 lists only an Article 80, 10 U.S.C. § 880 attempt as a lesser included offense for Article 107. False swear- ing remains an Article 134 offense under the 1984 Manual.

issues in *United States v. Jackson*, 26 M.J. at 378. It noted that military precedents were intended to parrot interpretation of the analogous federal statute, 18 U.S.C. § 1001, and that the United States Supreme Court recently had reexamined the scope of that section in *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). *Rodgers* rejected a narrow, technical meaning for Section 1001 and lower courts have followed that guidance in various current cases.[7] The Court of Military Appeals indicated that it would do likewise.

After considering views of commentators and studying the cases in some depth, we make these observations.

First, we discern a handful of cases which one might characterize as "I'm not the Regular Crew Chief" situations. These include *United States v. Arthur, United States v. Lauderdale,* and *United States v. Cummings.* Simply stated, these cases turn on a factual determination as to whether the hearer *was engaged in official duties involving the declarant* at the time in question. We have no hesitation in finding that the chief cashier in the instant case was so engaged. *See United States v. Harrison,* 26 M.J. at 476.

Second, we believe the dictum/holding of *Aronson* that a non-fiduciary may lie at will to investigators has been overtaken by later cases. *See, e.g., United States v. Jackson,* 26 M.J. at 378–379; *United States v. Davenport,* 9 M.J. 364 (C.M.A. 1980) (strenuous dissent by Judge Fletcher); *see also United States v. Heyward,* 22 M.J. 35 (C.M.A.1986).

Finally, we view the recent Court of Military Appeals decision in *United States v. Jackson,* 26 M.J. at 377 as clarifying the place where the legal line is to be drawn for today's military attorneys: 18 U.S.C. § 1001 is to be viewed in a forthcoming, liberal fashion.[8]

After weighing these authorities, we are convinced that the appellant was properly found guilty under applicable modern precedents. His assignment of error is resolved against him.[9]

### Was Appellant a "Suspect?"

In a Supplemental Assignment of Errors, the appellant argues that his statements to the head cashier were obtained in violation of his Article 31 rights. We find no merit in this contention. We are convinced that the military judge did not err in ruling that, factually, the appellant was not a suspect at the time of his false statement. *United States v. Lavine,* 13 M.J. 150, 151 (C.M.A.1982); *United States v. Trotter,* 9 M.J. 584, 585–586 (A.F.C.M.R.1980) and cases cited. Furthermore, the findings of a trial judge ordinarily will not be disturbed on review unless there are unsupported by the evidence or clearly erroneous. *United States v. Middleton,* 10 M.J. 123, 133 (C.M. A.1981); *United States v. Stroud,* 27 M.J. 765, 772 (A.F.C.M.R.1988). *See also United States v. Jackson,* 26 M.J. 377 n. 4.

### Admissibility of Letter of Reprimand

The appellant also argues that the military judge erred by admitting a letter of reprimand, over defense objection, which

---

**7.** Three such Federal circuit court cases are cited in *United States v. Jackson,* 26 M.J. at 379. There is also an excellent gathering of pertinent cases in *United States v. Gibson,* 881 F.2d 318 (6th Cir.1989). *Gibson* points out the sorts of false statements which are currently being held actionable. They include false statements to Governmental agencies, which, e.g., release disaster relief funds or Medicare payments. They also include statements to private entities which receive Federal funds, such as contractors building nuclear power plants or accountants who receive Federal funds for working various projects.

**8.** It is perhaps noteworthy that the *Rodgers* decision did not resolve all problems as to the scope of 18 U.S.C. § 1001. Though the Supreme Court's decision was unanimous, the Court reserved judgment on the definition of "department or agency" under Section 1001 with respect to falsehoods spoken involving an agency's housekeeping and administrative functions. *See United States v. Rodgers,* 466 U.S. at 483 n. 4, 104 S.Ct. at 1948 n. 4.

**9.** We leave for another time the question of whether the conduct in question could have been charged properly under Article 133, 10 U.S.C. § 933. *See United States v. Hallock,* 27 M.J. 146 (C.M.A.1988); *see also United States v. Taylor,* 23 M.J. 314 (C.M.A.1987); *United States v. Wiegand,* 23 M.J. 644 (A.C.M.R.1986).

served no corrective or management purpose.

■ The document in question was a reprimand dated 6 March 1989; it concerned an incident on 25 October 1988 when the appellant, who carries the AIDS virus, failed to inform medical officials of his HIV positive status. The lieutenant had been counselled earlier that he was to notify those treating him about his condition. He failed to so notify health authorities in October 1988, and an Army scrub technician accidentally had the appellant's infected blood splashed in his eye during elective surgery. (The appellant responded to the letter of reprimand by explaining that he believed that since the Air Force had referred him to an Army clinic for non-emergency treatment, he thought his HIV positive status had been relayed to the proper sources; moreover, he said, his medical record jacket was clearly marked to indicate he was HIV positive).

We are convinced that the letter of reprimand—though it may well have been served on the appellant in a tardy manner—fully complied with R.C.M. 1001(b)(2) and department regulations, AFR 35–32, *Unfavorable Information Files, Control Rosters, Administrative Reprimands and Admonitions*, Section C (15 January 1988).

The letter served a legitimate corrective purpose in stressing to the appellant the ongoing dangers for medical personnel in regard to the presence of the HIV antibody in the appellant's blood; it simply reemphasized the continuing duty to inform medical caregivers of the HIV positive status. *See United States v. Williams*, 27 M.J. 529 (A.F.C.M.R.1988) and cases cited.

As we indicated above, a military judge is presumed to know the law and apply proper discretion. *See United States v. Middleton*, and *United States v. Stroud*, both *supra*. We note that the prosecution had the commander standing by to testify and buttress its position that the reprimand was issued for a legitimate function; the military judge, while refusing admission of a second letter of reprimand on another topic, found it unnecessary for the witness to testify as to this matter. We too agree that the reprimand was admissible. *See*

*United States v. Hood*, 16 M.J. 557, 559 (A.F.C.M.R.1983); *see also United States v. Beaver*, 26 M.J. 991, 993 (A.F.C.M.R. 1988).

### *Sentence Appropriateness*

■ Finally, the appellant argues that his sentence is excessive, particularly in light of the probability of a limited life expectancy due to his being HIV positive. As the appellate Government brief aptly points out, this officer committed at least five dishonorable check frauds for over $450.00 in violation of Article 123a; he also received four letters of reprimand for delinquent debts. He was characterized during the closing prosecution sentencing argument as a "con man," an Air Force Academy graduate and Finance officer who took advantage of his commission to compile a dismal record of misconduct.

We believe the military judge, a seasoned veteran of the bench, exercised compassion and fairness in his sentence. Though we have sympathy for this officer, we find his sentence entirely appropriate.

The findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Senior Judge BLOMMERS and Judge MURDOCK concur.